**G. R. WATKINS, etc., et al., Appellants,**

**v.**

**Fred E. FUGAZZI, Mayor, et al., Appellees.**

Court of Appeals of Kentucky.

Oct. 1, 1965.

Weldon Shouse, Lexington, for appellants.

Robert Matthews, Atty. Gen., Richard S. Smith, Lexington, Jo M. Ferguson, Grafton, Ferguson & Fleischer, Louisville, for appellees.

Bert T. Combs, Foster Ockerman, Yancey, Martin & Ockerman, Lexington, Rodman W. Keenon, Stoll, Keenon & Park, Lexington, Earl S. Wilson, Kincaid, Wilson & Trimble, Lexington, John Y. Brown, Lexington, Dan E. Fowler, Thomas P. Bell, Fowler, Rouse, Measle & Bell, Lexington, amici curiæ.

PALMORE, Judge.

Appellants instituted this declaratory judgment action in behalf of themselves and other taxpayers similarly situated, CR 23.01, to test the validity of a proposed method of financing a "Downtown Urban Renewal Project" in Lexington. The trial court received proof by depositions and entered judgment sustaining the city's actions.

On April 1, 1965, the Board of Commissioners of Lexington adopted Ordinance No. 5144 describing an area in downtown Lexington and declaring it to be a blighted, deteriorated, or deteriorating area appropriate for an urban renewal project. KRS 99.530(1). The ordinance ratified a proposal of the Urban Renewal and Community Development Agency of the city (hereinafter called the Agency) for the preparation of surveys and plans for an urban renewal project embracing the area, approved the proposed financing plan on the basis of a capital grant of three-fourths of the cost thereof by the U. S. Housing and Home Finance Administrator (HHFA), 42 U.S. C.A. § 1453, and appropriated $37,000 to the

Agency for use in going forward with the plans.

On April 22, 1965, the Board of Commissioners adopted Ordinance No. 5159, which is the ordinance under attack. It recites that one of its purposes is to induce HHFA and the Agency to establish an urban renewal project in the proposed Urban Renewal Area. Recognizing that it would be necessary to issue revenue bonds to fund the city's portion of the expense, and further acknowledging that anticipated direct revenues (if any) from the project will not suffice to that end, the ordinance provides that " * * * it will be necessary to pledge all occupational license fees derived from the area * * * if and when such fees are received. * * * " The city's Director of Finance is directed to make separate accounting of and segregate all occupational license fees derived from the area, beginning July 1, 1965, and to hold such monies for appropriate disbursement for the intended purposes of the ordinance.

Ordinance No. 5159 was enacted pursuant to KRS 82.105 to 82.180 and expressly "finds that all occupational license fees derived from the described area, do, in fact, directly relate to the project, and by reason of increased or continued employment, will result in, and do constitute, increased receipts in the sense of KRS 82.145(2b)."

Evidence revealed that for 1964 the 1½% occupational license fees collected from the proposed urban renewal area under an existing ordinance amounted, in round figures, to $231,000 out of a city-wide total of $3,222,000. It is beyond cavil that the continued exodus, already substantial, of commercial enterprises leaving for more favorable locations will materially reduce the volume of business and employment in the area, and hence the occupational license fees collectible therefrom, unless it is rehabilitated. However, it is obvious that no one can predict in advance the rate and eventual extent of such decline, from which it follows that there is and will be in the future no way to distinguish between revenues that would have been realized anyway and those that result from the rehabilitation project.

The prime immediate objective toward achieving the ultimate purpose of the program is the removal of extensive railroad tracks from the "core area" of Lexington. The evidence substantially establishes that these railroad lines have throttled progressive development of the heart of Lexington and that there is little or no hope of a remedy except through the means now being pursued.

Appellants present these basic questions: (1) Does the project constitute a "governmental project" within the meaning of KRS 82.105 to 82.180? (2) If so, can the city pledge occupational license fees derived from the area to payment of bonds issued to finance the project? (3) May all such fees be segregated and pledged, or only that portion thereof which may somehow be identified as derived from new business and employment in the area?

The first of these questions is pretty well answered on the face of the statute, which defines a governmental project as "any building, structure, installation, activity, undertaking or program proposed by a governmental agency in furtherance of any lawful governmental or proprietary function of a governmental agency." KRS 82.105(4). Any doubt as to whether an urban renewal project qualifies as such an "undertaking or program" is eliminated by KRS 82.120, the first sentence of which says, "A city may exercise all or any of the powers conferred upon it in KRS 82.105 to 82.180 as incidents to the exercise of its urban renewal and/or urban redevelopment functions authorized and contemplated in and by KRS Chapter 99, or otherwise."

Appellants suggest that this legislation envisioned only governmental projects that employ personnel, such as the IRS data processing center in Grimm v. Moloney, Ky., 358 S.W.2d 496 (1962). Conceding that the immediate purpose of the statute

may have been to make it possible for the City of Covington to land the data processing center, it is nevertheless readily evident that its drafters were more far-sighted than to limit its application to the exigencies of that particular case. We think the language of the statute definitely refutes this contention.

The second and third questions are so interrelated that they are best discussed as one. They turn on the construction of KRS 82.145(2) (b), the pertinent provision of which is as follows:

> "If * * * the city shall make a legislative finding of fact, as recited in the body of the ordinance authorizing issuance of the bonds, that the governmental project is of such nature as to provide increased revenues to the city by reason of increased employment and resulting increased receipts from occupational license fees * * * then the city may pledge and covenant that it will cause to be deposited in said separate and special fund the receipts which may be definitely identified as accruing from such occupational license fees * * * by reason of employment in or directly related to the governmental project," etc.

■ The ordinance does not bind the city to continue for any period of time the imposition of occupational license fees. Hence there is no question of an unvoted debt within the proscription of Const. §§ 157 and 158. Cf. Grimm v. Moloney, Ky., 358 S.W.2d 496, 499–500 (1962); Turnpike Authority of Kentucky v. Wall, Ky., 336 S.W.2d 551, 557–558 (1960). The only problem here is one of statutory intent.

The city has made the requisite legislative finding, and no one suggests it is arbitrary, that the project is "of such nature as to provide increased revenues to the city by reason of increased employment and resulting increased receipts from occupational license fees." Therefore, it has express authority to pledge "the receipts which may

be definitely identified as accruing from such occupational license fees * * * by reason of employment in or directly related to the project." The real question in the case is whether this means all of the occupational license receipts collected from employment in the area of the project or only such portion thereof as can reasonably be identified as revenue that would not have existed except for the project.

■ There is room for difference of opinion, of course, but our conclusion is that a strictly literal construction of KRS 82.145(2) (b) favors the city's viewpoint. True, the city must first find that the project will bring *increased receipts from occupational license fees*, but when it has done that the statute does not say it may pledge only these *increased receipts*. It says the city may pledge "the receipts." What receipts? *All* occupational license receipts that can be definitely identified as accruing "by reason of employment in or directly related to the governmental project."

Except for the circumstance that in Grimm v. Moloney, Ky., 358 S.W. 496 (1962), most or all of the anticipated occupational license receipts would represent "new money" we descry no basis for the notion that only new money or new employment can come within the purview of the pledge authorized by this statute. As heretofore observed, clearly the law was not tailored to the figure of that case alone.

■ Further construing the statute in the light of its obvious purpose, we are of the opinion that "employment in" the project means employment in the territory formally embraced by the project. Just what "directly related" may be taken to mean is a question that does not confront us in this particular case.

It may be suggested that since the project must be in existence before any receipts can arise by reason of employment in it, and since Ordinance No. 5159 encompasses all receipts from the project area beginning

July 1, 1965, the project already exists and is no longer to be "induced," from which it follows that the city has no authority under KRS 82.105 to 82.180 to issue revenue bonds (the whole purpose of the statute being to induce the establishment of the project). It must be remembered, however, that the object of the chase is federal money, or, to say it more politely, federal participation. Without that the project evaporates. That the project technically is established by ordinance before HHFA finally approves it and joins in the financing is really immaterial, because until that time it is essentially contingent. If it falls through, the receipts set aside in anticipation of its success will revert to the city's general fund.

■ One other circumstance not thus far mentioned in this opinion bears comment. The territory designated for inclusion in the project is not confined to the long, narrow strip occupied by the railroad facilities, but extends over to embrace the business houses on one side of Main Street. It may be that this is not strictly necessary from the standpoint of rehabilitation. In fact, it would be naïve not to recognize that this valuable property on Main Street was included with an eye to the occupational license revenue it will be able to contribute. But the area a city chooses to place in an urban renewal project is primarily, if not exclusively, a matter of legislative discretion in which the courts have no legitimate power to interfere unless the action is so unreasonable that it can be called arbitrary and in violation of Const. § 2. Cf. Fowler v. Obier, 224 Ky. 742, 7 S.W.2d 219 (1928). It is not contended that the city has so acted in this instance.

The judgment is affirmed.

STEWART, Judge (dissenting).

I dissent from the opinion for reasons that will be given.

Upon the basis of a finding by ordinance that the area involved (which comprises, for the most part, a section of Lexington's downtown business district) is a "blighted, deteriorated and deteriorating area," the city has assumed the right to seek to induce its own independent instrumentality (the urban renewal and community development agency of the city of Lexington) and an organ of the federal government (HHFA) to establish what the city chooses to call a "governmental project" in the area described in the opinion. To accomplish this end, it seeks to come under the terms and conditions of KRS 82.105 through 82.180, which the Statute Reviser has compiled in the Kentucky Revised Statutes under the heading, "Inducing *Location* of Governmental Projects." (Emphasis added.)

Admittedly, the so-called "governmental project" is the removal of the railroad tracks from downtown Lexington. There is no indication in the record that any other urban development will be undertaken under the plan other than restoration work after the tracks are removed. The opinion stands for the proposition that this objective of the ordinance may constitute an urban renewal development venture and that it may be financed by the issuance of bonds.

A primary question is whether the removal of railroad tracks and such rehabilitation as may be a necessary result thereof is a governmental project within the meaning of KRS 82.105 through 82.180.

KRS 82.105(4) refers to a governmental project proposed by a "governmental agency"; and a governmental agency is defined by KRS 82.105(3) as the Commonwealth, the United States, or any division, department or instrumentality of either of them.

I believe the legislation under discussion envisioned the location within a city of a governmental agency which employs persons, similar to a new industry that is induced to come into the city, rather than a project involving the reconditioning contemplated here. This idea is made abun-

dantly clear in Grimm v. Moloney, cited in the opinion, wherein this statement appears:

"It may be said that the basis of the allocation of the portion of occupational tax revenue collected from employees of the Center is that it is 'new money,' for it would not be received but for the location of the enterprise and its expected payroll of $6,000,000. Doubtless, some of these employees would be subject to the occupational tax anyhow by reason of other jobs in the city. But it is suggested that other persons would take their places in case they transferred to the Center."

The city is undertaking to induce its own urban renewal and community development agency and HHFA, an instrumentality of the federal government, to spend some money to remove railroad tracks, but not to "locate" a governmental project within its boundaries. In my view this is not a governmental project within the purview of KRS 82.105 through 82.180.

In the instant case the occupational taxes pledged are from existing businesses rather than from new businesses. To this extent the present case goes beyond this Court's ruling in Grimm v. Moloney, supra; for, in that case the money pledged was considered *new money* that would originate from the creation of a *new project* "located" in Covington by a federal agency.

The action of the city is in fact a pledge of its revenue to support a bond issue without allowing the city to vote on the proposition. This practice was denounced in the case of Curlin v. Wetherby, Ky., 275 S.W.2d 934, 937. That case said on this point:

"We are of the opinion that to extend the special fund theory to include funds derived from taxes would result in sanctioning an evasion of the spirit and purpose of the constitutional prohibition against debt. In the final analysis, the practical result of a * * *

debt is that future government officials are prevented from expending, for what they consider the best purposes, the revenues received during their administration. The fact that the people have expressed, through the Constitution, their desire that certain revenues be expended only for a specified purpose, does not mean that the people intended their periodically elected representatives to have any authority other than to expend current revenues for that purpose."

The opinion makes no distinction between occupational taxes collected from employment or business in the area before the tracks are removed and those derived from the same area thereafter. All such taxes, regardless, so the opinion holds, may be pledged for the payment of the city's share of the expense incurred. This holding flies in the face of the plain unambiguous language of KRS 82.145(2) (b).

Reduced to its simplest terms this statutory subsection provides that the governmental project must be of such a nature as to provide *increased* revenue to the city by reason of *increased* employment from occupational taxes. Only when this condition exists may the city pledge and segregate the receipts "which may be definitely identified as accruing *from such* occupational license fees or taxes by reason of employment in or directly related to the governmental project."

Thus the clear import of KRS 82.145(2) (b) is that it applies solely to a governmental project that creates increased employment which provides increased revenues to a city. Does the removal of railroad tracks achieve this result? Certainly not. Furthermore, we conceive it to be impossible to definitely identify occupational tax receipts arising in the proposed urban renewal area "as accruing * * * by reason of employment in or directly related to the government project * * *."

The opinion states that the "ordinance does not bind the city to continue for any period of time the imposition of occupational license fees." The implication of this statement is that a prolonged debt is not incurred, even though an unconditional long-term pledge of a portion of the occupational taxes is made under the ordinance to meet the city's share of the cost that will be incurred. A city may not abandon its duty to collect occupational taxes in the area where it is now collecting such revenue for general city use in order to escape the obligation it seeks to assume in the case at bar. The method suggested by the opinion as a means of escaping liability, at some future time, for the expense of removing the tracks has been condemned by this Court. See Curlin v. Wetherby, supra.

I am convinced the plan proposed by the City of Lexington is not only unconstitutional but also is not supported by the statutory law of this state.

I would reverse the judgment.

I am authorized to state that HILL, J., joins me in this dissent.