**TURNPIKE AUTHORITY OF KENTUCKY,**
a Corporation, et al., Appellants,

v.

Thomas H. WALL, on behalf of himself and all other taxpayers of the Commonwealth of Kentucky, Appellee.

Court of Appeals of Kentucky.

June 24, 1960.

John B. Breckinridge, Atty. Gen., Holland McTyeire, Asst. Atty. Gen., H. D. Reed, Jr., Frankfort, Cornelius W. Grafton, Louisville, for appellee.

Henry E. McElwain, Jr., Oldham Clarke, McElwain, Dinning, Clarke & Winstead, Louisville, for appellee.

PALMORE, Judge.

This action was brought by the appellee as a taxpayer, for himself and all other taxpayers of the state, against The Turnpike Authority of Kentucky (hereinafter called the Authority) and its individual members for a declaration of rights as to the constitutional validity of Senate Bill 223, Laws 1960, c. 172 (KRS 175.410 to 175.990, hereinafter called the Act) enacted by the General Assembly at its regular 1960 session. Various questions of constitutionality and interpretation not specifically presented in the complaint were raised by counterclaim.

The judgment of the trial court declared three provisions of the Act unconstitutional and void but upheld the remainder of the Act upon a determination that such provisions are separable.

Appellants (defendants) seek reversal on the ground the judgment is erroneous in declaring any part of the Act unconstitutional. By cross-appeal appellee (plaintiff) questions the correctness of those portions of the judgment declaring the remainder of the Act valid.

Statutory authority for the construction and financing of toll turnpikes directly by the Department of Highways (hereinafter called the Department) through the issuance of revenue bonds of the Commonwealth already exists in KRS 177.390 to 177.570 (Chapter 157, Acts of 1950) and

was held constitutional in Guthrie v. Curlin, Ky. 1953, 263 S.W.2d 240. The "Kentucky Turnpike" now in operation from Louisville southward was constructed and financed pursuant to that authority.

The Act here in question does not repeal or amend KRS 177.390 to 177.570 but provides an alternative method to achieve the same objectives. It creates the Authority as an independent corporate agency of the Commonwealth composed, ex officio, of the Governor, Lieutenant Governor, Attorney-General, Commissioner of Highways, and State Highway Engineer, and vested with the ordinary incidents of corporate existence but with no power of taxation, nor those powers of cities, counties and other political subdivisions usually associated with the functions of local government (policing, local legislation, etc.). It is authorized under certain conditions to construct toll turnpikes (including service stations, garages, restaurants and various other facilities) and issue its revenue bonds to finance them, and the Department may lease any such turnpike project from the Authority for an agreed rental, but not beyond the end of the legislative biennium in which the lease is executed. As of the end of that legislative biennium it may exercise an "option" to renew for the ensuing legislative biennium, but no longer, and so on for successive biennial terms until final maturity of the bonds to which the lease is related.

The option cannot be renewed until after adjournment of the session of the General Assembly at which appropriations shall have been made for the operation of the state government for the ensuing biennium, and the lease is automatically renewed for two years, effective on the first day of such biennium, in the absence of written notice of the Department's election *not* to renew, delivered to the Authority before the close of business on the last working day in April immediately preceding the renewal biennium.

During each biennial term when the lease has been renewed and is in force the Department is obligated (to the extent of its "available funds * * * not required by law or by previous binding contract to be devoted to some other purpose") for the agreed rental for that biennium, but as an incident of renewal receives all the tolls and other revenues of the turnpike project. They are segregated and pledged for payment of and credited against the rent. Thus the liability assumed by the Department upon renewal for a biennium is the difference between the amount of rent agreed upon in advance and the revenues actually produced by the project.

In addition to the tolls and other revenues of the project, while the lease is in force there is required to be set aside and paid over to Authority, for application as provided in the bond obligation, and to be credited against the rent in the same manner as the tolls and other revenues of the project, "all motor fuel taxes collected by the department on gasoline and other motor fuels consumed on such turnpike, except the two-sevenths of said motor fuel taxes provided in KRS 138.220 to be set aside for * * * rural and secondary roads." A formula based on estimated mileage per gallon for various types of vehicles is provided for determination of the amount of taxes collected on motor fuels consumed on the turnpike.

In the event the tolls and revenues (including fuel taxes) so provided shall at any time appear insufficient to defray the rental obligations on schedule the Department must estimate the rate of deficiency on a semi-annual basis and pay the amount thereof to the Authority in equal monthly payments out of "any other available funds of the department not required by law or by previous binding contract to be devoted to other purposes," and, as it is expressed in § 12(4) of the Act, it may covenant to make up all or any part of such deficiency "from any funds or tax revenues available for general purposes of the department and not required by law to be devoted to some other purpose."

If the Department elects not to renew the lease at the end of any biennium the right to establish and collect the revenues of the project passes to the Authority, which must then make out for its bondholders as best it can from the turnpike revenues (including fuel taxes) alone. In such event, however, the turnpike must remain open, subject only to the exaction of tolls; neither the Authority nor its bondholders are authorized to close the road and deny its use to the traveling public. Under such circumstances, however, if the revenues should prove insufficient to service the bonds the Authority could increase the tolls.

The Department may agree, in the lease or otherwise, that after completion of the project it "will continuously pay all or any part of the cost of repairing, maintaining and operating the project" as a public highway equitably belonging to the Commonwealth. As to this agreement the Department is contractually bound not only for the biennium but for the entire period of years until final maturity of the bonds.

When the Authority's bonds for a project have all been paid the project is to be conveyed to the Commonwealth, but this is subject to a further provision that a turnpike project may be combined for financing purposes with one or more others, in which event tolls may be continued (or, if previously discontinued, reimposed) in the interest of such common financing.

The Act says that the bonds issued by the Authority shall neither constitute a debt nor be supported by a pledge of the faith and credit of the Department or of the Commonwealth. The period to maturity may not exceed forty (40) years, and the bonds may be sold at public or private sale in such manner and for such price as the Authority may determine will best effect the purposes of the Act, the cost of the money not to exceed a rate of 6% per annum.

The bonds and the income therefrom are exempt from taxation within the Commonwealth and are eligible for investment of funds of public officers and public bodies, insurance, trust, saving and investment companies, trustees and other fiduciaries.

The chancellor held the following portions of the Act invalid:

(1) § 17, wherein the bonds are declared eligible investments for fiduciaries and public funds (as not germane to the title);

(2) The provisions of §§ 7(h) and 12(5) authorizing the pledge "for any period extending beyond the end of a legislative biennium in which such pledge is made, of motor fuel taxes identified as being paid on motor fuel consumed on a turnpike project of the Authority" (as creating a debt in violation of Const. §§ 49, 50); and

(3) The provision of § 12(4) authorizing a covenant by the Department to "make up any deficiencies of revenues of a turnpike project, from time to time, 'from any funds or tax revenues available for general purposes of the department and not required by law to be devoted to some other purpose,'" (also as creating a debt in violation of Const. §§ 49, 50).

The further principal respects in which appellee contends the Act should have been held invalid are:

(a) The over-all substance of the legislation is not sufficiently indicated by the title;

(b) The provision for a contract between the Department and the Authority is a fictional arrangement designed to permit the Authority to do what the Department cannot itself do, to-wit, create a debt of the Commonwealth in substance if not in form, violating Const. §§ 49, 50;

(c) The lease would be a long-term contract with option to cancel rather than a short-term lease with option to

renew, creating a continuing obligation violating Const. §§ 49, 50;

(d) Renewal or non-cancellation of the lease prior to the beginning date of the biennium for which it is to be effective would be premature and illegal;

(e) The provisions for permanent maintenance by the Department create an obligation in futuro, also violating Const. §§ 49, 50; and

(f) The provisions authorizing re-imposition of tolls on a turnpike project after it is once freed are illegal.

The title of the Act is as follows:

"An Act relating to turnpikes and providing a method, alternative to KRS 177.390 to 177.570, for the construction and financing thereof; creating The Turnpike Authority of Kentucky as an independent corporate agency and instrumentality of the Commonwealth for such purpose, and prescribing its membership, powers and manner of proceeding; authorizing the Authority to make agreements and leases with the Department of Highways for the construction and operation of turnpikes and appurtenant facilities, and for the financing of such construction by the Authority through issuance of its revenue bonds; providing for the payment of such bonds; and declaring an emergency."

■ It is our opinion that the character of the bonds as being eligible for the investment of public and other funds held in trust is germane to the title. That the Commonwealth is willing for such funds to be so invested is an assurance of value to the prospective purchasers of the bonds, and it is not an unprecedented provision in legislation authorizing revenue bonds. See, for example, KRS 177.520 and KRS 99.430 (9). We are of the opinion also that all of the other contents of the Act "are naturally related to, and reasonably connected with, the subject expressed in the title, and

the body of the act contains no matter foreign to the title." Cf. J. D. Van Hooser & Co. v. University of Kentucky, 1936, 262 Ky. 581, 90 S.W.2d 1029, 1031. Therefore, the title was sufficient.

■ With respect to the charge that a contractual arrangement between the Department and the Authority cannot be at arm's length and is a fiction, we find it no different in principle from the financing of the Capitol Annex bond issue through the device of leases from the State Property and Buildings Commission to various agencies of the state, approved in Preston v. Clements, 1950, 313 Ky. 479, 232 S.W.2d 85, nor, indeed, from the situation in school revenue bond and other similar cases where a city or some other technically independent entity standing between the bondholders and the political agency for whose benefit the project exists has no more real freedom of action under the circumstances than a dummy in a strait jacket. The answer to the suggestion that the special corporation may do what the state, through the Department, may not do itself is simply that it cannot. In the final analysis the Authority can have no power that the General Assembly could not authorize to be exercised by the Department, and it is, of course, the purpose of this litigation to test whether the Act does in fact purport to confer upon either of these agencies any power that the General Assembly could not validly authorize.

■ It may be conceded as fundamental that the legislature can authorize the commitment of revenues anticipated during the biennium for which its appropriations are to be budgeted. See Billeter & Wiley v. State Highway Comm., 1924, 203 Ky. 15, 261 S.W. 855, and annotations at 92 A.L.R. 1299 and 134 A.L.R. 1399. It was on this theory that proposed biennial leases were recognized as valid in Preston v. Clements, 1950, 313 Ky. 479, 232 S.W.2d 85. Therefore, to the extent that the Department is authorized to obligate all or any part of its previously unencumbered rev-

enues anticipated for this two-year period there is no question. On the other hand, should a renewal of the lease, however effected, commit the general revenues of the Department for more funds than can be properly anticipated during the period of the extension it would be a void renewal, for it would attempt more than the legislature itself has the right to sanction.

■ Does the fact that the renewal is automatic in the absence of affirmative action to terminate make the lease in legal effect a long-term obligation? It was held otherwise in Davis v. Board of Education of City of Newport, 1935, 260 Ky. 294, 83 S.W.2d 34, and we regard that precedent as dispositive of the question here.

■ Is the timing of the renewal option fatal in that it is to be exercised before the beginning of the biennium for which it is effective? Alluding again to the power of the legislature to obligate revenues provided by itself for the biennium, we find no substantive violation of constitutional principle in its permitting the election to be made after adjournment and before July 1. The option would, if earlier exercised, be construed as becoming valid and binding at the time the biennial appropriation to the Department becomes law and thus would come within the cover of anticipated revenues, from which the obligation would be payable.

Legislative authority for a continuing obligation of the Commonwealth, by contract, to pay the cost of maintaining and operating a turnpike project was held valid in Guthrie v. Curlin, Ky.1953, 263 S.W.2d 240, 243, wherein it was said: "As we construe the statute and contract, they mean merely that the state will include the toll road in the regular maintenance program of the Highway Department." The Act in question is so drawn that a turnpike project constructed thereunder remains a public facility regardless of the status of the lease. Therefore, there is no tangible distinction between the two cases, and no basis to con-

strue the obligation to maintain and operate the project otherwise than it was so recently construed in Guthrie v. Curlin.

■ The Act contemplates that two or more turnpike projects may be combined for financing purposes and by its terms makes the freeing of each project subject to what may be likened to a conditional limitation, a divestiture of the freedom if and when it is determined expedient in connection with an authorized common financing arrangement. The provision authorizing reimposition of tolls after a project is once freed does not contravene any constitutional principle.

We are thus brought to the sinewy aspects of the controversy, wherein the chancellor ruled invalid those portions of the Act intended to authorize, beyond the two-year lease periods and until maturity of the bonds, (a) the pledge of a portion of the fuel taxes levied by the state and (b) a covenant by the Department to make up any deficiency between the project revenues and the bond requirements out of any funds available to it at the time the deficiency occurs.

In Crick v. Rash, 1921, 190 Ky. 820, 229 S.W. 63, 64, it was said that an obligation of the State Highway Commission to repay monies advanced to it by counties would have constituted an unauthorized "debt," though technically payable from a "special road fund," had it exceeded anticipated current revenues theretofore unencumbered. Billeter & Wiley v. State Highway Comm., 1924, 203 Ky. 15, 261 S. W. 855, held that contracts could not be made for expenditures against general revenues anticipated from future levies. In State Highway Commission of Kentucky v. King, 1935, 259 Ky. 414, 82 S.W.2d 443, 445, a bridge revenue bond case, the Commission proposed to contract that if there should be a deficiency in the bridge revenues to meet the bond requirements "there shall be advanced from any other available funds under the control of Kentucky State Highway Commission such amounts as may

be necessary to cover any such deficiency * * *. In the event such other funds are not available * * * the Kentucky State Highway Commission shall include, in its next biennial budget of the State Road Fund, such appropriations as may be necessary to cover such deficiency," etc. Citing Billeter & Wiley v. State Highway Comm., 1924, 203 Ky. 15, 261 S.W. 855, this court disapproved the proposed contract as a contingent obligation against the *general fund* of the highway commission extending "beyond the biennial period to which the commission is limited in anticipating its revenues."

The line of authority illustrated by the three cases just cited culminates in Curlin v. Wetherby, Ky.1955, 275 S.W.2d 934, 937, wherein the 1954 Act of the General Assembly, c. 439 establishing a Kentucky Highway Authority to hold title, issue bonds and lease highways to the state was held invalid because it purported to authorize the Department of Highways to pledge, for the full term of 40 years, its "current resources" (meaning *all* funds accruing to the State Road Fund except for the two-sevenths of the gasoline tax earmarked for rural highways, and certain other minor exceptions). Declining an invitation to flirt with the "special fund theory," the court held that an obligation of the general funds of the Department was a "debt" for the reason that the state could not disengage itself therefrom by discontinuing the levy of taxes and appropriation of funds for such an unavoidable function of government as the construction and maintenance of public highways.

In each of the four Highway Department cases just mentioned there was in practical effect an attempt to impress a first and prior charge upon all funds, as and when received, that the legislature might see fit to make available, from any source, for highway purposes. This was held tantamount to a general obligation against the future taxing power of the state, prohibited by Const. §§ 49 and 50.

■ The pledge of that portion of future gasoline taxes reasonably identified as derived from vehicular use of the particular turnpikes being financed would neither constitute a charge against the general revenues and resources of the Department nor prevent the legislature from discontinuing the fuel tax as a source of revenue. Therefore, would it create a "debt" in the constitutional sense?

"Although the cases are not entirely in accord and dissenting opinions have been frequent, it has generally been held that an obligation payable from a special fund created by the imposition of fees, penalties, or excise taxes, and for the payment of which the general credit of the state is not pledged and resort may not be had to property taxation, is not a debt within the meaning of constitutional debt limitations. Such a limitation applies solely to that arising from a general levy and not excise taxes." 49 Am.Jur. 280 (States, Territories, and Dependencies, § 67); see also annotation at 100 A.L.R. 900.

"The words 'debt' or 'debts,' as used in these two sections [Const. §§ 49 and 50], are restricted to the meaning conveyed by their use in connection with the entire language of the sections. 'Debt' or 'debts' as used therein mean an obligation entered into in strict accordance with the provisions of these sections, binding the commonwealth to pay it by the levy and collection of general taxes under section 171." State Budget Commission v. Lebus, 1932, 244 Ky. 700, 51 S.W.2d 965, 969.

We are not inclined to accept at face value the proposition that an excise tax can be pledged to the payment of bonds issued to finance an unrelated project without creating a "debt." However, the relationship between a turnpike facility, the gasoline measurably used on it, and the tax on gasoline so measured is sufficiently direct and apparent to support the concept that such portion of the gasoline tax may be treated as a revenue of the project, and since the Act of itself makes no commit-

ment, expressly or by implication, that this particular tax will continue to be levied it is our opinion that §§ 7(b) and 12(5) do not create a debt in violation of Const. §§ 49 and 50.

In reaching the foregoing conclusion with respect to the allocation and pledging of an identifiable portion of the fuel taxes we take cognizance of the fact that the $100,000,000 voted obligation discussed in Dalton v. State Property and Buildings Commission, Ky.1957, 304 S.W.2d 342, does to the extent therein mentioned commit the state to continue such taxes in force and constitutes a prior charge against the proceeds. The prospect that this commitment might interfere with the pledge authorized by the Act in question now seems remote, but it must be recognized that if it does the fuel taxes must be first applied to the earlier encumbrance.

■▇▇▇▇▇ In defending the provision of § 12(4) of the Act authorizing a covenant by the Department to make up any deficiency from funds or tax revenues available for its general purposes and not required by law to be devoted to some other purpose, appellant cites as comparable precedent KRS 58.130, which provides as follows:

"Any governmental agency may use * * * for the payment of interest or principal on any revenue bonds issued by the agency * * * any funds or tax revenues available for general purposes of the agency and not required by law to be devoted to some other purpose."

The permission given an agency by that statute so to use its funds in the future as they may be available does not purport to authorize an advance commitment to do so. True, the statute may therefore be meaningless, adding nothing to the authority the agency may possess without it. Nevertheless, the ordinary situation is that on July 1 the whole or at least major part of all revenues and resources appropriated to

an agency or department of the state are unencumbered, and thus "available for general purposes of the agency and not required by law to be devoted to some other purpose." Therefore, a prior contract amounting to a "pledge" would require satisfaction out of these general revenues ahead of all other requirements of the agency, the precise result forbidden by Curlin v. Wetherby, Ky.1955, 275 S.W.2d 934, and State Highway Commission of Kentucky v. King, 1935, 259 Ky. 414, 82 S.W. 2d 443.

The difficulty in § 12(4) would not be remedied by construing it to embrace the procedure set forth in § 7(g) of the Act, which provides that during the term of the lease, as it may be extended, in event of a deficiency the rate thereof will be estimated on a semi-annual basis conforming to the interest payment dates of the bonds and the Department will pay the amount of estimated deficiency in equal monthly installments from any other available funds not theretofore obligated, adjusting the estimates to actual deficiencies 30 days before the next interest payment date. To the extent that this procedure is confined to the annual appropriations available to the Department within the current biennium covered by the lease the authority to incur the obligation is, of course, less than and embraced within the Department's power to commit the whole of its current revenues if it so desires. But if the contract to make up deficiencies in this manner extends beyond the current biennium it runs irresistibly afoul of the same snag noted in the preceding paragraph of this opinion. The occurrence and existence of a deficiency, and not the election of the Department, precipitates and impresses a first and prior charge upon the general resources of the Department not theretofore encumbered. That it may be adjusted every six months does not avoid its essential character as a contingent obligation in futuro chargeable against whatever revenues the legislature may see fit to place at the disposal of the Department. Hence it does not satisfy

the fundamental objection expressed in Curlin v. Wetherby, Ky.1955, 275 S.W.2d 934, and State Highway Commission of Kentucky v. King, 1935, 259 Ky. 414, 82 S.W.2d 443.

Paragraphs 4(a) and 4(b) of the judgment, declaring § 17 and certain provisions of §§ 7(h) and 12(5) of the Act to be invalid, and so much of paragraph 10 of the judgment as awards injunctive relief against the implementation of those sections, are in error. In all other respects the judgment is correct.

Judgment affirmed in part and reversed in part on direct appeal, with directions to modify the decree in accordance with this opinion, and affirmed on cross-appeal