Harold B. McGUFFEY, etc., et al., Appellants,

v.

William W. HALL, M. D., et al., Appellees.

William W. HALL, M. D., et al., Cross-Appellants,

v.

Harold B. McGUFFEY, etc., et al., Cross-Appellees.

John B. FLOYD, Jr., M. D., et al., Cross-Appellants,

v.

W. Neville CAUDILL, M. D., in his official capacity as President of the Kentucky Peer Review Organization, Inc., etc., Cross-Appellees.

Supreme Court of Kentucky.

June 21, 1977.

Rehearings Denied Sept. 16, 1977.

Richard S. Smith, Gen. Counsel, Joseph D. Hudson, Dept. of Ins., Frankfort, William E. Scent, Tarrant, Combs & Bullitt, Lexington, Victor Fox, Asst. Atty. Gen., Frankfort, for appellant and cross-appellee Harold B. McGuffey, Com'r.

Don H. Major, Mulhall, Major, Turner & Taylor, Louisville, for appellant and cross-appellee W. Neville Caudill, M.D.

Morton J. Holbrook, Ronald M. Sullivan, Jesse T. Mountjoy, Sandidge, Holbrook & Craig, P.S.C., Owensboro, for appellees and cross-appellants William D. Hall, M.D., et al.

Kent Masterson Brown, Joseph L. Arnold, Robert M. Odear, Lexington, for appellees and cross-appellants John B. Floyd, Jr., M.D., et al.

John C. Darsie, Jr., Gen. Counsel, Lexington, for amicus curiae University of Kentucky.

Carl L. Wedekind, Jr., Stites, McElwain & Fowler, Louisville, for amicus curiae Kentucky Medical Ass'n.

Edgar A. Zingman, Grover C. Potts, Jr., J. Baxter Schilling, Wyatt, Grafton & Sloss, Louisville, for amicus curiae Kentucky Hospital Ass'n.

PALMORE, Justice.

At its regular session in 1976 the General Assembly enacted a bill entitled, "AN ACT relating to health care malpractice insurance and claims." § 1 of the Act stated its purpose and § 11 its effective date. § 9 was an amendment of KRS 311.377, and the

remaining eight sections became part of KRS Chapter 304, Title 10. In two separate declaratory judgment actions which eventually were consolidated various parties challenged the constitutional validity of the Act and certain of its provisions. The case was submitted to the trial court on briefs and the pleadings and culminated in a judgment declaring §§ 10(3), 10(8)(c), and 10(9) unconstitutional and the remainder of the enactment valid. The matter comes to this court on appeals and cross-appeals and, in addition to the parties, other interested organizations have been allowed to participate in the argument as *amici curiae.*

■ All of the objections raised in these two lawsuits were aimed at §§ 9 and 10 of the Act. Hence the judgment of the trial court was a bit too broad in declaring that with certain exceptions the entire enactment is valid. Other individual sections and subsections are in issue only insofar as it is claimed that by reason of constitutional defects in §§ 9 and 10 the whole Act is void. As a passing caveat, however, and without implying any approval of the other unlitigated portions of the Act, we express deep misgivings with respect to § 3, which relates to procedure and appears clearly to invade the rule-making authority of the court.

■ The first and most serious objection to § 9 is that it is not germane to the subject of the Act and therefore falls athwart § 51 of the Kentucky Constitution.[1] We think the point is well taken. The subject of the Act is not, as the Commissioner argues, "health care," but "insurance and claims." The nouns "insurance" and "claims" are restricted by the modifying adjective "malpractice," which is further restricted by the term "health care" used in an adverbial sense. Hence the title reaches only such subjects as have some reasonable relationship to medical malpractice claims or insurance.

As indicated in the first paragraph of this opinion, all of the operative contents of the Act were created as sections of KRS Chapter 304 except for § 9, which was an amendment of KRS 311.377. KRS Chapter 304 is the Insurance Code. KRS Chapter 311 is entitled, "Physicians, Osteopaths and Podiatrists," and excepting a provision for anatomical gifts relates entirely to the practice of medicine, osteopathy and podiatry. Before its amendment by the Act in question KRS 311.377 was a simple little statute providing that physicians and dentists shall not be liable in damages for good-faith actions taken by them in the performance of their duties as members of certain specified peer review boards. The 1976 Act replaced it with a new statute consisting of seven subsections providing in substance as follows:

(1) The content of what formerly was KRS 311.377 is broadened in scope to protect not only the members of certain review groups, but also other participants, employes and advisers, and to embrace review groups constituted by various agencies not theretofore enumerated in KRS 311.377. Among the review groups listed in the new statute are "professional standards review organizations," or PSRO's, which are regional boards created by federal law in connection with what are commonly called the Medicare and Medicaid programs.[2]

(2) The proceedings and records of the review groups mentioned in subsection (1) are made immune "to discovery, subpoena, or introduction into evidence, in any civil action in any court or in any administrative proceeding before any board, body, or committee, whether federal, state, county, or city."

(3) Nothing in subsection (2) is to be construed as restricting the right to discover or use in civil actions or administrative proceedings any evidence discoverable independently of the review proceeding mentioned in subsection (1).

1. "No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title," etc.

2. § 249F, Social Security Amendments of 1972, 42 U.S.C. § 1320c.

(4) No person who presents or offers evidence in the aforementioned review proceedings, or who was then a member of the review group, may refuse to testify, except as provided in subsection (5), in discovery or upon the trial of a civil action as to any evidence covered in subsection (3) or as to any information within his own knowledge.

(5) No person shall be permitted or compelled to testify concerning his own or any other testimony except that of a defendant given in the review proceeding, or concerning any opinion formed by him as the result of such proceeding.

(6) In an action involving the denial of staff privileges by a health care entity, representatives of that entity may with its permission testify concerning any evidence presented in the proceedings leading to the denial in question.

(7) Nothing in § 9 is to be construed as restricting the presentation of testimony, records, findings, opinions, etc., "or other actions" of any review group mentioned in subsection (1) in any statutory or administrative proceeding relating to its functions or duties.

[4] Although conduct that results in a malpractice claim may also eventuate in a peer review proceeding, the relationship between the two is purely coincidental. A peer review is not designed to serve any purpose of a malpractice claim, and to the extent that the confidentiality conferred upon it serves to protect those who participate in the proceedings, it is a protection against suits for defamation, not malpractice.

§ 51 of the Kentucky Constitution has enjoyed, or suffered, an extremely liberal construction over the years, and we realize that time and technology have diminished the risks of deception it was intended to guard against. Still, however, it is not a lifeless anachronism, and there are wholesome limits to what can be loaded into one bill. We have only to ponder the incredible morass in Washington, D.C., to be admonished against what can happen to legislation when it can be made up, sidetracked, taken apart, switched around and put together again like a freight train. Happily, our Constitution does not permit it. We are of the opinion that the subject-matter of § 9 of the Act is not sufficiently related to malpractice claims or insurance to satisfy Const. § 51. See *Stovall v. Cook,* Ky., 512 S.W.2d 487 (1974).

■ We agree also with the contention that insofar as § 9(2) of the Act purports to include federally-constituted PSRO's it invades a field the Congress has chosen to occupy and therefore has pre-empted. § 1166 of the 1972 Social Security Amendments [3] provides in effect that all information acquired by a PSRO shall be confidential except as otherwise provided by regulations issued by the Secretary of HEW. Legislation or regulation in the same area by the various states would engender that very confusion the doctrine of pre-emption serves to prevent. *Cf. Pennsylvania v. Nelson,* 350 U.S. 497, 504, 76 S.Ct. 477, 100 L.Ed. 640 (1956); *Charleston & Western Carolina R. Co. v. Varnville Furniture Co.,* 237 U.S. 597, 604, 35 S.Ct. 715, 59 L.Ed. 1137 (1914).

■ The remaining attacks on § 9 of the Act are less persuasive. The protection against liability extended by subsection (1) does not violate Const. § 54.[4] See *Jacobs v. Underwood,* Ky., 484 S.W.2d 855, 857 (1972), which we decline to overrule. Though we are unaware of the source of authority by which the legislature of this state may determine just what shall be admissible and not admissible in the federal courts or in the courts and administrative tribunals other than our own, we are not convinced at first blush that the evidentiary limitations placed upon the proceedings of review groups by subsections (2) and (5) conflict

---

3. 42 U.S.C. § 1320c–15.

4. "The General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property."

with §§ 2,[5] 3,[6] 14,[7] 59,[8] or 60 [9] of the Kentucky Constitution. We refrain, however, from passing final judgment in that respect in this opinion.

§ 10 of the Act consists of nine subsections, as follows:

(1) A state agency named the Kentucky Patients' Compensation Fund (hereinafter called the Fund) is created within the Department of Insurance, and is to be managed under regulations of the Commissioner of Insurance.

(2) Every physician licensed and practicing in Kentucky and every hospital located in Kentucky shall be a member of the Fund, except that the Commissioner may grant an exception to "any physician who has a limited practice, or is in such special circumstances that he should not reasonably be required to participate in the fund."

(3) Every member of the Fund must carry professional liability (malpractice) insurance with minimum coverage of $100,000 per occurrence and $300,000 in the aggregate for all claims occurring in any one policy year or, in the alternative, must qualify as a self-insurer.

(4) The basic requirements for self-insurers are specified.

(5) Each member of the Fund must pay into it an annual assessment (as fixed by the Commissioner) not exceeding 10% of the premium for the insurance required by subsection (3) or, in the instance of hospitals, not exceeding $50 per bed. For commercially-insured members these assessments are to be collected in the form of a surcharge by the respective insurers, which are then to pay the money so collected to the Fund. Assessments against self-insurers are determined on the basis of prevailing insurance premiums.

(6) If a member of the Fund is unable to acquire the insurance coverage required by subsection (3), or to acquire it at a cost not exceeding three times the average cost to other insureds of the same class and experience, the Commissioner is authorized to provide "coverage within the fund" to the extent of $100,000—$300,000, to designate a commercial insurer as the servicing carrier for the party so insured, and to charge for such coverage a premium not exceeding three times the average cost to others in the same risk category. The maximum number of members who may be thus accommodated in any one year is 10.

(7) The financial resources of the Fund are to be used for the payment of malpractice judgments against and settlements made by its members in excess of the basic $100,000—$300,000 insurance coverages, and for reimbursing the amounts of judgments, settlements and costs paid and incurred by the servicing carriers mentioned in subsection (6).

(8) A claimant who has recovered a judgment against or made a settlement (approved by the Commissioner) with a member covered by the Fund may collect from the Fund such portion of it as exceeds $100,000, subject to the limit that not more than $1,000,000 per year may be paid to one claimant under one judgment or settlement. Subsection (8)(c) then provides that if the Fund becomes exhausted such claims "shall be paid out of the general fund of the commonwealth . . .. Any such funds drawn from the general fund shall be repaid with interest at the legal rate [by the

5. "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic . . .."

6. "All men . . . are equal; and no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men . . .."

7. "All courts shall be open . . . and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law . . .."

8. "The General Assembly shall not pass local or special acts . . . where a general law can be made applicable, no special law shall be enacted."

9. "No law shall be enacted granting powers or privileges in any case where the granting of such powers or privileges shall have been provided for by a general law . . .."

Fund] at the earliest practicable time" as determined by the Commissioner.

(9) Carriers providing insurance described in subsection (3) must report cancellations and nonrenewals to the Commissioner. A member who fails to meet the requirements of subsections (3) or (5) is to be reported by the Commissioner to the appropriate state licensing authority, which must then conduct a hearing requiring the delinquent member to show cause why his or its license should not be suspended.

In a preamble to the Act the General Assembly stated in substance that there is in this state a crisis with respect to the availability and cost of medical malpractice insurance, increasing the cost of health care and making it more difficult to attract new doctors and hospitals and to keep those we have, which in turn will have an adverse effect on the health and welfare of its citizens. In simple terms, the root of the problem is that the insurance industry apparently is becoming less willing to insure against malpractice and is charging prohibitive rates when it does. This is the setting against which we must determine the place and scope of the police power as it relates to the means chosen by the General Assembly to address the stated problem. No evidence was taken, nor were any exhibits filed or facts pleaded to explain just how the provisions of the Act might serve to alleviate the problem at which it is aimed. Except, therefore, for the preamble, we are consigned mainly to the realm of judicial notice for information.

■ It will be observed that by establishing the Fund, which is to be financed through compulsory assessments against the medical community, and from which is to be paid that portion of any malpractice judgment or approved settlement in excess of the commercial insurance coverage required by subsection (3), § 10 of the Act does provide a new source of coverage which otherwise would be available only from the insurance industry. Hence this provision has an easily discernible relationship to the scarcity and high cost of malpractice insurance. Improvidently, however, and obviously in contravention of Const. §§ 50 [10] and 177,[11] the drafters of the Act sought to make the general fund of the state a guarantor.

■ It does seem to us that by this time, with all of the cases that have been decided under Const. § 50, its simple message should be clear to all. No commitment against future general revenues can be made without a vote of the people. This is nothing less than the keystone guaranty of the state's fiscal responsibility. No agency of the state, including its legislature, can place an obligation against the general funds otherwise available for appropriation and expenditure by a future legislature. The long series of decisions applying that principle to the resources of the state highway department was reviewed in *Turnpike Authority of Kentucky v. Wall,* Ky., 336 S.W.2d 551, 556–557 (1960). It is no answer to say that the general fund will be tapped only temporarily, in the form of a loan. The general revenues of 1986 can no more be committed to the purchase of an I.O.U. from the Fund than they could be committed to pay for any other asset placed on order by the legislature of 1976.

■ The Commissioner cites KRS 45.321, a section of the chapter on budget and financial administration, which provides that budget units of the state having bona fide receivables may be permitted to establish receivable accounts with corresponding credits to allotment accounts.[12]

---

10. "No act of the General Assembly shall authorize any debt to be contracted on behalf of the Commonwealth . . . unless provision be made therein to levy and collect an annual tax . . . to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election," etc.

11. "The credit of the Commonwealth shall not be given, pledged or loaned to any individual, company, corporation or association, municipality, or political subdivision of the State . . . .."

12. Ch. 260, § 8, Acts of 1974.

We have not been called upon to construe or pass on the validity of that section, but it cannot validly be taken to mean that presently-existing receivables can be traded for access to future general revenues. In short, the restriction of Const. § 50 against obligating future general revenues is not satisfied by substituting other assets equal in value to the forbidden encroachment. As we see it, the purpose of Const. § 50 is to see that each generation is left free to make its own trades with its own money.

■ With respect to Const. § 177, which prohibits lending the credit of the Commonwealth, *Hager v. Kentucky Children's Home Soc.,* 119 Ky. 235, 83 S.W. 605, 607, 67 LRA 815 (1904), held that an annual appropriation of $15,000 to a charitable corporation devoted to the care of destitute children did not involve a giving or lending of credit. The opinion then went on to say that because the purpose was public the act did not offend Const. § 171,[13] and there has been some tendency to misconstrue the language of *Hager* referring to Const. § 171 as applicable to Const. § 177 as well. Clearly, however, whether the objects of an expenditure are "public" or otherwise is irrelevant to Const. § 177:

"The state cannot now loan or give its credit to any person or corporation for any purpose—public or otherwise." *Hager v. Kentucky Children's Home Soc., supra,* 119 Ky. 235, at 83 S.W. 607.

In *Industrial Develop. Auth. v. Eastern Ky. Reg. Pl. Com'n, Ky.,* 332 S.W.2d 274, 278–279 (1960), this court again was called upon to determine whether an act authorizing the use of public funds violated Const. § 177, and it held that the lending of money is not a giving or lending of credit:

"The transactions the Authority would be empowered to make under the Act would involve only a loan of state funds. In such a case, the Authority would not be giving or pledging or lending the credit of the state, because the Authority would not be undertaking to become a surety on, or guarantor of the payment of, any bonds or other obligations in which the state's money was invested. It would be in the position of a creditor rather than in that of a debtor, which last-mentioned situation arises upon a pledge or loan of credit." *Id.,* at 332 S.W.2d 278.

In that case, however, the agency in question was authorized to lend money drawn out of a revolving trust fund then and there available for current expenditure. There was no authority at any time to commit funds to be derived from future tax revenues. Here, on the other hand, the Fund is underwritten by a guaranty in which the general funds of the state derivable from future tax revenues are made the surety. If becoming a surety does not amount to a lending of credit, then there cannot be such a thing, in which event it must be concluded that in drafting Const. § 177 the members of the 1891 Convention were just whistling "Dixie."

After holding that a loan of public money does not involve the public credit, the opinion in *Industrial Develop. Auth. v. Eastern Ky. Reg. Pl. Com'n, supra,* at 332 S.W.2d 274, cites the following excerpt from *Almond v. Day,* 197 Va. 782, 91 S.E.2d 660, 667 (1956):

"When the underlying and activating purpose of the transaction and the financial obligation incurred are for the state's benefit, there is no lending of its credit . . ."

The statement is too broad. As specifically pointed out in *Hager* (119 Ky. 235, 83 S.W. at p. 607), Const. § 177 does not permit the state's credit to be given or lent for any purpose, public or otherwise.

*Stovall v. Eastern Baptist Institute,* Ky., 375 S.W.2d 273 (1964), also did no more than distinguish between the making of loans and the lending of credit, so it holds no lesson for this case. In *Greer v. Kentucky Health and Geriatric Authority,* Ky., 467 S.W.2d 340, 342 (1971), this court did uphold a guaranty arrangement, but the significant difference is that the guaranty fund was to consist of future appropriations

---

13. ". . . Taxes shall be levied and collected for public purposes only . . . ."

if, as and when made by the legislature out of revenues then currently available to and expendable by it. Such an arrangement would have been perfectly feasible in this instance, in which event those persons having claims against the Fund would have been limited to its assets then existing without a guarantee of its solvency through recourse to the general funds of the state.

In several instances this court has held that contracts requiring the state to bear the costs of maintaining certain adjuncts of its public highway system do not violate Const. § 177. *Guthrie v. Curlin,* Ky., 263 S.W.2d 240, 243 (1953); *Turnpike Authority of Kentucky v. Wall,* Ky., 336 S.W.2d 551, 556 (1960); *Ward v. Louisville & Nashville Railroad Company,* Ky., 402 S.W.2d 98, 100–101 (1966). Insofar, however, as those decisions pertain solely to the "credit" aspect of Const. § 177, they do not uphold the obligations on the basis of "public purpose," but through the device of construing them to mean only that the facilities in question would be included "in the regular maintenance program of the Highway Department." What that program will or will not amount to at any given time is left entirely to the discretion of each succeeding session of the legislature.

One of the *amicus curiae* briefs cites *City of Louisville M. H. Com'n v. Public Housing Admin.,* Ky., 261 S.W.2d 286 (1953), for the proposition that Const. § 177 "does not apply to state agencies." The cited opinion did not so hold. Its observation that the prohibition in Const. § 177 "is directed to the Commonwealth as such and not to an agency such as this Housing Commission is shown to be" refers not to the "credit" aspect of § 177, but to the portion stating that the Commonwealth shall not "become an owner or stockholder in, nor make donation to, any company, association or corporation".

 It could be argued (but was not) that in providing that the credit of the Commonwealth shall not be given, pledged or loaned "to any individual, company, corporation or association, municipality, or political subdivision of the State", Const.

§ 177 does not prohibit using the state's credit to back the financial integrity of one of its own agencies, and that § 10(1) of the Act expressly constitutes the Fund as a "state agency." We think, however, that the listing of entities to which the state's credit may not be given was intended to be all-inclusive. Literally, it covers everything but the federal government, other states, foreign countries, and the Commonwealth itself. Yet surely it would not be contended that the section does not prevent the use of the state's credit to shore up the obligations of the federal government, or of some foreign state or country.

 In 1891 the kind of governmental administrative agency that is so prevalent today was virtually unknown, and it would not have occurred to the members of the Convention that there might be a need to prohibit using the credit of the state for the benefit of one of its own administrative agencies. But the purpose is clear. Like Const. § 50, which we have already discussed at some length, the "credit" provision of Const. § 177 seeks to prevent transactions that might result in future liabilities against the general resources of the state and thereby encroach upon the freedom of another generation to utilize those resources as it then deems necessary or appropriate. It is a "clincher," making certain that if perchance some court might hold a contingent or secondary liability not to be a "debt" under Const. § 50, it would nevertheless fall under the interdict of Const. § 177. These two constitutional provisions, originating in the fiscal follies of the 19th century, bespeak the same motivating thought. In contrast with the federal constitution, state constitutions ordinarily forbid one generation from stealing the earnings of another, at least without a vote of the people as a whole. The encroachment here would be quite small and insignificant, but the principle of the thing is just that simple.

Summarizing our position on this phase of the controversy now before us, we reiterate that by attempting to underwrite the Fund, through recourse to the general fund

of the state, § 10(8)(c) of the Act creates a debt in violation of Const. § 50 and lends the credit of the state in violation of Const. § 177. We need not reach the question of whether it also violates Const. § 230.[14]

The other portions of the Act declared invalid by the trial court were subsections (3) and (9) of § 10, which provide that every doctor and hospital shall carry no less than $100,000—$300,000 malpractice insurance coverage or must qualify as a self-insurer and that one who fails to do so will lose his or its professional license.

Considering similar legislation in *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399, 408 (1976), the Supreme Court of Idaho upheld the insurance requirement as a reasonable exercise of the state's police power:

"We hold that such requirements of obtaining medical malpractice insurance as a condition to licensure bear a rational relationship to the health and welfare of the citizens of the state *by providing protection to patients who may be injured as a result of medical malpractice and to this extent does not violate the guarantees of due process of law.*" (Emphasis ours.) *Id.,* 97 Idaho 859, at 555 P.2d 408.

It is interesting to observe that while arriving at this conclusion the Idaho court at the same time remanded other aspects of the case to the trial court for the purpose of developing factual information sufficient to disclose the relationship between the problem sought to be solved and the means chosen to solve it:

"It is argued that the Act is a necessary legislative response to a 'crisis in medical malpractice insurance' in Idaho, but the record does not demonstrate any such 'crisis.' Further, there is no evidentiary basis presented here to either support or refute the relationship between the limitations [on amounts of recovery in malpractice suits] created by the Act and the abatement of the alleged crisis. . . . the record here presents no factual basis for understanding

the nature and scope of the alleged medical malpractice crisis nationally or in Idaho." *Id.,* 97 Idaho 859, at 555 P.2d 412, 413.

■ No doubt our Const. § 54 [15] dampened any legislative disposition to limit the amounts recoverable in medical malpractice suits, as was done in Idaho. What we find odd, however, is that while the Idaho court required evidence to reveal the nature and scope of the stated problem as it might be ameliorated by limiting the amounts of recovery, it apparently had no difficulty in relating it to compulsory insurance. Here, we suggest, somebody got lost in the horse latitudes, because "protection to patients who may be injured as a result of medical malpractice" [97 Idaho 859, 555 P.2d at p. 408, quoted above] most emphatically is *not* the problem this kind of legislation is intended to solve. And it is on this particular point that we find ourselves unable to see, either from the record or by way of judicial notice, just how a scarce commodity (malpractice insurance) is to be rendered any less scarce by requiring every eligible party to buy it.

■ § 1 of the Act states in substance that its purpose is to promote the health and general welfare of the general citizenry through adopting reforms in medical malpractice claims, establishing the Fund so as to increase the availability and lower the cost of medical malpractice insurance, and assuring that medical malpractice judgments and settlements will be satisfied. Conceding, therefore, that the payment of malpractice claims is within the stated purposes of the Act, still it does not appear to have any reasonable relationship to the problem stated in the preamble or to any other problem or threatened problem shown to exist. Is there, for example, any problem or threatened problem in the form of unsatisfied claims against doctors and hospitals? Not to our knowledge. If not, and especially when the legislature has not suggested that there is, must its existence be

---

14. "No money shall be drawn from the State Treasury, except in pursuance of appropriations made by law . . . ."

15. *Supra,* n. 4.

presumed from the bare circumstance that the legislature has acted on the subject? We do not think so. The police power does have limits.

"It is fundamental that such [an] extraordinary power is not without limitation, for it may not operate unreasonably beyond the occasion or necessity of the case. It may not unreasonably invade private rights and thus violate those rights guaranteed under either the Federal or the State Constitution. . . . The exercise of the power must have a substantial basis and cannot be made a mere pretext for actions that do not come within its scope. To state it another way, the action of the government may not arbitrarily invade liberty or property rights under the guise of police regulation." *Bond Bros. v. Louisville & Jefferson County Met. S. Dist.,* 307 Ky. 689, 211 S.W.2d 867, 872 (1948).

"It is true that legislative bodies possess what the opinions designate as 'the primary authority' to determine whether or not the particular enactment is justified under authority conferred by the Police Power. Therefore, when the law-making department has so determined the rule is, that the courts should hesitate to declare otherwise.

"But the power of the courts to so declare is not thereby denied or taken away. In determining such questions judicial knowledge may be consulted and relied on, and if from that knowledge, or any other source, it appears that the grounds upon which the legislature based its action are arbitrary and unfounded in fact it is not only the right but the duty of courts to say so and declare the consequences." *City of Louisville v. Kuhn,* 284 Ky. 684, 145 S.W.2d 851, 854 (1940).

"The rule is that, in order to sustain legislative interference with the business of the citizen, by virtue of the police power, the act or ordinance must have some reasonable relation to the subjects included in such power. If it is claimed that the statute or ordinance is referable to the police power, the court must be able to see that it tends in some degree towards the prevention of offenses, or the preservation of the

public health, morals, safety, or welfare. It must be apparent that some such end is the one actually intended, and that there is some connection between the provisions of the law and such purpose. If it is manifest that the statute or ordinance has no such object, but, under the guise of the police regulation, is an invasion of the property rights of the citizen, it is the duty of the court to declare it void." *Tolliver v. Blizzard,* 143 Ky. 773, 137 S.W. 509, 510–511, 34 L.R.A. (NS) 890 (1911).

"Moreover, the law must tend toward the accomplishment or promotion of the enumerated objects in a degree that is perceptible and clear." *Schoo v. Rose,* Ky., 270 S.W.2d 940, 941 (1954).

In more recent cases we have said that the police power "is as broad and comprehensive as the demands of society make necessary." *Jasper v. Commonwealth,* Ky., 375 S.W.2d 709, 711 (1964); *Stephens v. Bonding Ass'n of Kentucky,* Ky., 538 S.W.2d 580, 583 (1976). It is acknowledged also that the legislative branch of government has the prerogative of declaring public policy, and that the mere wisdom of its choice in that respect is not subject to the judgment of a court. *Fann v. McGuffey,* Ky., 534 S.W.2d 770, 779 (1975). Nevertheless, these statements in the abstract, like most creeds and principles, are little more than slogans. Their real meaning is to be found only in the pragmatic examples to which they have been applied. The "demands of society" do not, for example, or should not, obviate the necessity for a more orderly process of constitutional amendment. And even if they did, they cannot be made to exist by legislative *ipse dixit.* They must, in short, be somehow discernible in the mists by the judicial branch of government as well. Otherwise, why a Constitution?

The boundaries of the police power simply have to be sketched out on a case-by-case basis. No one case can be controlled by the window-dressing of another. Coming down to the facts of this particular case, we can take judicial notice that the

problem recited in the preamble of the Act does exist. It is common knowledge that insurance companies have become increasingly chary of providing medical malpractice insurance and that as a result, such insurance has become so expensive that some members of the medical community may very well curtail their services rather than insure against the risks, to the detriment of the general public, which in one way or another ultimately pays the bill in any event. The legislature has declared in effect that the public should not be forced to pay in the form of a shortage of health-care services, which in turn means that it must pay in money, in that the cost of the insurance the medical community is required to buy will inevitably be passed on to the consumers of health-care services. That may indeed be a legitimate legislative choice, but how does it (1) increase the availability, or (2) reduce the cost, of medical malpractice insurance? We do not know and cannot imagine. And how does the protection thus assured to potential malpractice claimants relate to either of those objectives? The answer is that it appears not to relate to them at all.

Nor could we justify the compulsory aspect of the insurance provisions on the theory that the potential claimants need the protection. The need for workmen's compensation was obvious, because we know that industry always had taken its toll of workmen in the form of injuries for which the common law provided no relief. The need for compulsory automobile-liability insurance is equally clear, because the uninsured motorist is a known and recognized public menace who should have been outlawed long ago. Doctors and hospitals, on the other hand, can hardly be placed in a similar category. One rarely, if ever, hears of unsatisfied claims against them, whether or not they are insured. If statistics indicate a contrary trend in this state, they should be made known, because otherwise we are unable to envision any occasion for compulsory insurance as it relates to the protection of patients against unsatisfied malpractice claims.

 We therefore hold, as did the trial court, that the provision for compulsory malpractice insurance has not been shown to be justified as an exercise of the police power, in the absence of which any interference with the natural right of any individual or group to pursue a legitimate business or profession is a violation of Const. 1(5) [16] and 2.[17] Cf. *Southern Linen Supply Co. v. City of Hazard,* 286 Ky. 626, 151 S.W.2d 758, 760 (1941); *Bruner v. City of Danville,* Ky., 394 S.W.2d 939, 942 (1965). We express no opinion with respect to the due process provisions of the federal Constitution, which in latter times has become something of a moving target, defying captivity.

The discussion thus far barely opens the lid on the multitude of constitutional objections leveled at § 10 of the Act. Realizing that the patience of the reader whose sturdy horse Perseverance has carried him to this point must be wearing thin, we shall deal with them briefly, as follows:

 1. The provision of § 10(2) authorizing the Commissioner to exempt "any physician who has a limited practice, or is in such special circumstances that he should not reasonably be required to participate in the fund", undoubtedly would have been declared invalid in earlier times, because it indicates no criteria or guidelines within which the Commissioner's discretion is to be exercised and thus purports to confer an arbitrary power in violation of Const. § 2.[18] Certainly this was a limping effort to provide legislative guidance. It could and should have been done better. Nonetheless, in *Butler v. Cerebral Palsy of Northern Ky., Inc.,* Ky., 352 S.W.2d 203, 208 (1961), we laid out a new course which was thought to be a more practical approach to the "delegation" problem, holding that in appropriate instances a cabinet-level officer or depart-

---

**16.** ". . . The right of acquiring and protecting property."

**17.** *Supra,* n. 5.

**18.** *Supra,* n. 5.

ment of the executive branch of the state government may be given broad authority to establish uniform standards and regulations within the scope of the enabling legislation. The theory was that it is better to wait and see what these standards and regulations are and then apply the constitutional tests to the legislation *as thus implemented* rather than to strike down the enactment itself merely because it might be arbitrarily administered or extended. In a sense, this approach is analogous to the "wait and see" aspect of the perpetuities law enacted in 1960.[19] Thus we do not find this particular provision of § 10(2) unconstitutional on its face. Properly implemented, it would violate neither §§ 2,[20] 3,[21] 27,[22] 28,[23] 29,[24] 59[25] nor 60[26] of the Constitution. We reach the same conclusion regarding the Commissioner's authority to fix the rate of surcharges under § 10(5) of the Act.

■ 2. The provision of § 10(6) limiting to 10 the number of members who may in any one year be insured within the Fund appears to be arbitrary and violation of Const. § 2.[27] We do not think, however, that it confers a special privilege in violation of Const. § 3[28] as held in *Barker v. Crum,* 177 Ky. 637, 198 S.W. 211 (1917), with respect to tuition-free scholarships; or that it would constitute special legislation under Const. § 59;[29] or that it would offend the portion of Const. § 60 which forbids the enactment of any law that is to become effective upon the discretion of some person or authority other than the legislature.

■ 3. The burden of collecting and handling the surcharge mentioned in § 10(5) of the Act would not violate the rights of malpractice insurers under §§ 2,[30] 3,[31] or 13[32] of the Constitution.

■ 4. The argument that existing contracts for malpractice insurance exceeding the $100,000—$300,000 coverage specified in § 10 of the Act would be rendered unnecessary by § 10(7), which provides similar excess coverage by the Fund, and that the obligation of such existing contracts would be thereby impaired in violation of Const. § 19[33] scarcely merits notice. We do not accede to that proposition.

■ 5. Neither would the requirement of § 10(9) of the Act, imposing upon insurers the burden of reporting cancellations and non-renewals, impair their contracts.

■ 6. The requirements of § 10(2) and (5) that all physicians and hospitals be members of and contribute to the Fund do not amount to a taking of property without just compensation[34] or an arbitrary classification.[35] Cf. *Bennett v. Oregon State Bar,* 256 Or. 37, 470 P.2d 945, 53 A.L.R.3d 1291 (1970). This particular provision would be a permissible exercise of the police power because the Fund, which in effect provides

---

19. Ch. 167, § 2, Acts of 1960 (KRS 381.216).

20. *Supra,* n. 5.

21. *Supra,* n. 6.

22. "The powers of the government . . . shall be divided into three distinct departments," etc.

23. "No person . . . being of one of those departments, shall exercise any power properly belonging to either of the others . . . ."

24. "The legislative power shall be vested in a House of Representatives and a Senate . . ."

25. *Supra,* n. 8.

26. *Supra,* n. 9.

27. *Supra,* n. 5.

28. *Supra,* n. 6.

29. *Supra,* n. 8.

30. *Supra,* n. 5.

31. *Supra,* n. 6.

32. ". . . nor shall any man's property be taken or applied to public use . . . without just compensation . . . ."

33. "No ex post facto law, nor any law impairing the obligation of contracts, shall be enacted."

34. Cf. Const. § 13, *supra,* n. 32.

35. Cf. Const. §§ 2 and 3, *supra,* notes 5 and 6.

insurance coverage aside from that which is available from commercial insurance carriers, bears a tangible and reasonable relationship to the public problem with which the Act purports to deal. We do not mean to suggest, however, that the members of any profession or business could validly be required to undertake the responsibility of providing for the payment of all malpractice judgments rendered against any of them.

7. The payment of private claims out of the Fund, as authorized by § 10(7), would not violate the requirement of Const. § 171 that public funds be used only for public purposes, because the Fund is drawn from private sources and contains no public money. For the same reason, among others, Const. § 58 [36] is not involved.

8. The restriction of § 10(8)(b) on the amount payable out of the Fund in any one year is in no sense a limitation on the claimant's right of recovery. To the contrary, the availability of the Fund as an additional source of recovery really would be a gratuitous windfall to the claimant. Const. §§ 54 [37] and 241 [38] have no application to this phase of the Act.

9. Though not presented in the arguments, there is one other aspect of the compulsory insurance requirement that bears mention. We bring it up here for the same reason that we have attempted to cover the other constitutional points that are not strictly necessary to a resolution of the appeals—that is, in order to provide some guidance in the event of further legislation designed to eliminate the constitutional defects hereinbefore identified. We have held the compulsory insurance requirement invalid because there is neither a showing nor anything else of which we may take judicial notice to indicate how it might tend to alleviate the problem of scarcity and high cost of medical malpractice insurance. It is entirely possible that this deficiency can be remedied. It should be recognized, in any event, that even if compulsory insurance, as such, is permissible, there are limits to what the members of any profession or business may reasonably be required to pay. They simply cannot be thrown to the mercy of the insurance industry regardless of the cost. The Act here in question, for example, literally would force doctors and hospitals to buy insurance even if the premium rates equalled or exceeded the limits of coverage. Presumably the Department of Insurance would prevent such a result, but of course there are limits also to what a state regulatory agency can do. What we say here is that a blanket mandate to insure or else, be the cost what it may, might very well invite constitutional trouble beyond that which has been resolved in this opinion.

KRS 446.090 declares in substance that if any part of a statute be declared invalid the remaining parts shall remain in force unless the General Assembly has provided to the contrary or unless the remaining parts are essentially and inseparably connected with and dependent upon the unconstitutional part. In this case only §§ 9 and 10 of the Act have been challenged specifically. § 9 is invalid because its contents are not fairly included in the subject of the Act. It is readily apparent that those portions of § 10 we have held invalid are so essential to that section as a whole that the remainder of the section could not stand without them. Hence § 10 is invalid in its entirety. We see nothing in the remaining sections of the Act that would prevent severability.

The judgment is affirmed in part and reversed in part with directions that it be modified in conformity with this opinion.

All concur.

---

**36.** "The General Assembly shall neither audit nor allow any private claim against the Commonwealth . . . ."

**37.** *Supra,* n. 4.

**38.** (Recovery for wrongful death.)