Larry HAYES, State Budget Director, R. Scott Plain, Special Amicus Curiae, Charles Hoffmaster and Jerry Hammond, Appellants,

v.

The STATE PROPERTY AND BUILDINGS COMMISSION of Kentucky, Appellee.

Supreme Court of Kentucky.

June 11, 1987.

William E. Scent, Scent and Scent, P.S.C., Paducah, for Larry Hayes.

Kyle T. Hubbard, William J. Nold, Nold, Miller, Mosley, Clare, Hubbard & Townes, Louisville, for Charles Hoffmaster and Jerry Hammond.

R. Scott Plain, Wilson, Wilson & Plain, Owensboro, special amicus curiae.

Spencer E. Harper, Jr., William W. Davis, Harper, Ferguson & Davis, Louisville, Charles Wickliffe, Gen. Counsel, Finance & Administration Cabinet, Patrick Abell, Gen. Counsel, Commerce Cabinet of Kentucky, David L. Armstrong, Atty. Gen., Frankfort, for appellee.

WINTERSHEIMER, Justice.

This appeal is from a judgment which determined that Senate Bill 361 adopted by the Kentucky General Assembly and the actions taken by the State Property and Buildings Commission pursuant thereto were constitutional insofar as they related to certain incentives granted to the Toyota Motor Corporation.

We are called upon to review the constitutionality of the financial arrangements undertaken by the Governor, General Assembly, Commerce Cabinet and State Property and Buildings Commission. Acting through the executive and legislative branches of government, Kentucky has agreed with Toyota to convey a 1600–acre project site in Scott County which the Commonwealth will acquire and develop for $35 million. Kentucky was involved in a fierce competition with many of the other states of this nation regarding the location of a major automotive manufacturing plant by Toyota in the United States. The project site is part of a total package of inducements to Toyota to build a plant capable of producing up to 200,000 cars annually and employing up to 3,000 people. The Toyota agreement promises a total package of inducements which could have a direct cost to the state estimated at between $125 million and $268 million as presented in the evidence to the circuit court. Other incentives include state financing of comprehensive worker training programs, highway improvements, assistance to Toyota in securing foreign trade zone status, assistance with rezoning and other related matters. These estimates do not consider the indirect cost to the State. The sum needed to acquire and develop the site will be generated by a revenue bond issue from the State Property and Buildings Commission. The funds needed to pay the debt service on the bonds, principal and interest, will be provided by appropriations from the General Funds of the Commonwealth on a biennial basis as an expense item of the Commerce Cabinet.

The declaratory judgment action asked the circuit court to decide if SB 361, the project and the financing thereof were consistent with Sections 3, 49, 50, 51, 59, 60, 171 and 177 of the Kentucky Constitution. These constitutional provisions relate to state action in general and the authority of the General Assembly in particular. The trial court approved the constitutionality of the financing arrangements and this appeal followed.

The parties of record are the State Budget Director and two private citizens who were permitted to intervene in order to challenge the constitutionality of the legis-

lation, a special amicus curiae appointed to represent the public pursuant to the rules of this Court in such cases and the State Property and Buildings Commission and other constitutional and cabinet officers. In a practical sense, the parties who have a real interest are the people of this Commonwealth who have a right to a determination of whether the executive and the legislature have acted within the limitations of their constitutional power, the executive and legislative branches of government who sponsored and enacted the legislation, and Toyota, the industry induced to come to this Commonwealth.

As a general principle of jurisprudence, it is well established that duly adopted legislation is entitled to a presumption of validity. All statutes shall be liberally construed with a view to promote their objects and carry out the intent of the legislature. KRS 446.080. Our constitution is a limitation on the broad exercise of power rather than a grant of specific power to the legislature. The General Assembly may enact laws which are not expressly or impliedly prohibited by the Constitution of Kentucky and the Constitution of the United States. In this instance, the legislature working in conjunction with the executive, determined that it was proper to attempt to alleviate unemployment and develop economic strength in the state through the financing of an industrial development project pursuant to the act which constitutes the effectuation of a proper public purpose.

Initially, we must observe that the law is well settled that the wisdom of legislative and executive action may not be reviewed by the courts. Whether any project is based on sound economic theories is not within the scope of judicial review. Such considerations are matters of legislative and executive judgment and do not necessarily affect the constitutionality of the conduct. *See Dalton v. State Property and Buildings Com.*, Ky. 304 S.W.2d 342 (1957). Our role is not that of a super legislature. Our only function is in the interpretation of the acts of the other branches of government in the light of the Constitution, existing legal precedents and the legislation itself.

The circuit court did not commit reversible error in determining that SB 361 does not violate Section 177 of the Kentucky Constitution.

The specific language of Section 177 involved is that the credit of the Commonwealth shall not be given, pledged or loaned to any individual company or corporation, nor shall the Commonwealth make a donation to any company or corporation.

The act specifically provides by its terms that industrial development projects may be conveyed to industrial entities at the time of the issuance of revenue bonds by the Commission for the financing of such projects only if in addition to the fulfillment of other conditions precedent, the commission has made a written determination based on diligent investigation that the incremental taxes to be derived as a result of the development are reasonably expected to be at least equal to the principal amount of the proposed revenue bonds, and the industrial entity to which the project is conveyed undertakes and agrees that in the event of conveyance prior to the collection of the incremental taxes in an amount equal to the principal of the bond, the industrial entity will pay the Commonwealth the difference between the taxes collected to date and the principal amount of the bonds. No conveyance of publicly financed property without the receipt of fair market value compensation will occur in connection with the Toyota project. The Commission has made the necessary findings required by the statute. It would be economic madness for Toyota to expend up to $800 million for the plant and then fail to use it. Even standing idle, the development would generate additional property taxes.

■ Section 177 of the Constitution wisely prohibits the giving of the credit of the Commonwealth or the making of a donation to any private corporation or individual. However, as long as the expenditure of public money has as its purpose, the effectuation of a valid public purpose, Section 177 is not offended even in situations where the conveyance occurs without consideration. *See Industrial Development*

*Authority v. Eastern Regional Planning Com.,* Ky. 332 S.W.2d 274 (1960); *Kentucky Livestock Breeders' Assn. v. Hagger,* 120 Ky. 125, 85 S.W. 738 (1905).

The evidence in the record indicates that incremental taxes to be collected in order to constitute sufficient consideration for the conveyance of the property are estimated at $13 million per year.

Incremental taxes are those taxes which would never have existed *but for* the inducement of the facility to locate in Kentucky. *See Grimm v. Maloney,* Ky. 358 S.W.2d 496 (1962) and *Watkins v. Fugazzi,* 394 S.W.2d 594 (1965). The successful inducement of location of a revenue producing facility is an important element which provides a new source of tax revenue which did not previously exist. The overriding lesson of both *Grimm* and *Watkins* is that the inducement of the new facility provides new revenues which would not have existed but for the location of the plant.

Ultimately the state income tax is expected to benefit in relation to a payroll in excess of $75 million in new wages resulting from an employment of up to 3,000 new jobs. There is clearly a difference in the taxable value of the previously rural farm land which now will become an industrial complex and there are undoubtedly new corporate taxes which will be assessed. In addition there is a ripple effect in that other plants will also produce new wages and new property and corporate taxes. The fair market value of the real estate itself is also enhanced by the development of the plant. All of this produces new sources of revenue for the state.

■ We are persuaded by the reasoning set out in *Almond v. Day,* 197 Va. 782, 91 S.E.2d 660 (1956), when the Virginia Supreme Court in interpreting the use of certain funds of the Virginia Retirement System, noted that Section 185 of the Virginia Constitution is very similar in its import to Section 177 of the Kentucky Constitution. The Virginia court stated that when the underlying purpose of the transaction and the financial obligation incurred are for the benefit of the State, there is no lending of

credit even though it may have expended its funds or incurred an obligation that benefits another. Merely because the state incurs an indebtedness for its benefit and others may incidentally profit does not bring the action within the letter or the spirit of the prohibition of lending of state credit. *Industrial Development Authority v. Eastern Kentucky Regional Planning Commission,* Ky. 332 S.W.2d 274 (1960) provides that it is clearly established in Kentucky that the relief of unemployment is a public purpose that would justify the outlay of public funds.

■ It should be noted that the two year financing agreement otherwise provided in Section 171 of this Constitution is totally subject to the actions of future legislatures in appropriating funds for the renewal of the agreement. This requirement complies in every respect with the previous case rulings by this Court. The credit provisions of Section 177 attempt to prevent transactions which might result in future liabilities against the general tax revenues of this state and thereby encroach on the freedom of future generations to utilize those resources as they deem appropriate. This is not the case.

It is the assurance that the legislature would provide for funding in future appropriations which has been most offensive to this Court. *See McGuffey v. Hall,* Ky. 557 S.W.2d 401 (1977); *Greer v. Kentucky Health and Geriatrics Authority,* Ky. 467 S.W.2d 340 (1971). This legislation does not commit any future funds to the Toyota project. It is significant to note that in *Greer, supra,* the transfer of title to the real estate occurs when the revenue bonds have been discharged. In that case this Court found that such transaction was not a lending or giving of the credit of the Commonwealth to a private corporation within the meaning of Section 177. The difference here is that the transfer of title can occur initially but that provisions must be included in the financing transaction to assure receipt of fair market value by the State for the property in the event of premature disposition by the company.

The various arrangements provided by Senate Bill 361 and the finance agreement, require the Commerce Cabinet to include a request for an appropriation in its biennial budget to pay for the bond service. There is no guarantee that the General Assembly will affirmatively act on such request. Toyota is clearly at the mercy of the Kentucky legislature in a technical and legal sense. In no sense is this either a lending of the credit of the state or a misrepresentation. The bondholders and those executing the agreements for Toyota are clearly apprised of the risks involved in this transaction. Under no circumstances is the credit of the state the immediate financial foundation for the issue.

The obligation of Toyota to pay taxes in the future is significantly more than the obligation of any taxpayer on the semi-rural tract in question. The new taxes are incremental in nature and would not exist but for the establishment of the industrial complex. In no sense of the word is the conveyance of the project site a donation to a private corporation as prohibited by Section 177.

In contrast to the background of the Constitutional Convention of 1890, there is no attempt to exempt any corporation from taxation but rather there is a commitment required by law to pay additional and new taxes and to thereby enhance the revenues of the Commonwealth as well as provide distinct benefits to the people of the Commonwealth. This is not a specious pretext of performing public services, but rather an intelligent, aggressive and thoroughly legal action by the executive and legislative branches.

A careful examination of the financial arrangements leads us to conclude that the subject legislation is indeed in keeping with both the letter and the spirit of constitutional provisions and no evasion of any fundamental law. *Cf. Commonwealth v. O'Harrah*, Ky. 262 S.W.2d 385, 389 (1953).

The court was correct in holding that SB 361 does not violate Sections 3 and 171 of the Kentucky Constitution. Section 3 of the Constitution prohibits separate privileges except in consideration of public services and Section 171 is closely related to it because it provides the taxes shall be collected and levied only for public purposes. These sections also are complimentary to Section 177.

SB 361 expressly declares that the authority granted and the purposes to be served are public in nature and the preamble indicates that it is the policy and purpose of the Commonwealth to encourage, promote and support economic development in order to alleviate and prevent unemployment and that these goals constitute an essential public purpose.

We must first consider that Section 3 of the Constitution refers to public services while Section 171 speaks of taxes to be collected for public purposes only. The precise meaning of the two different words "public services" and "public purpose" should not be unduly troubling. There is an absence of exact general definition or definition in the context of the Constitution. Common sense dictates that the words are totally compatible. This Court has recognized previously that the sections are closely related. *Nichols v. Henry*, 301 Ky. 434, 191 S.W.2d 930 (1946).

If the purposes served by an action constitute public purposes for which tax revenues may be levied and expended under Section 171, the manner of the use and expenditure is also proper under Section 3, and is not a private use as distinct from a public use. *See Hager v. Kentucky Children's Home Society*, 119 Ky. 235, 83 S.W. 605 (1904); *Kentucky Livestock Breeders Assn v. Haggar, supra.*

The relief of unemployment is a public purpose within the purview of the case law and the constitution. The important point is whether the purpose is public and not whether the agency through which it is dispensed is public. The appropriation is not made for the agency or company but for the public purpose or object which is to be served.

Under no conditions is Toyota the beneficiary of any double counting of future taxes. The taxes involved here are uniform on all property of the same class

subject to taxation. There is no constitutional infirmity in providing for the use of future incremental taxes to buttress the issuance of revenue bonds. As has been previously discussed, the legislation is adopted in an effort to alleviate unemployment. Section 3 prohibits exclusive or public emoluments except in consideration of public service. The public service provided here is reduction of unemployment which would not occur but for the inducement to locate here and is a direct benefit to the people of this state which they should not be deprived of by any hypertechnical interpretation of the letter of the Constitution. The Constitution is to protect the people from their government and not to deprive them of the legitimate activities of government intended to provide public benefit and public service. The definition of public purpose when made by the legislature should be upheld by the court as long as it has some reasonable basis. The fulfillment of the intent of the law will undoubtedly accord private industry considerable profit yet the ultimate objective of the act and its declared purpose is not only to alleviate unemployment but also to foster the prosperity of the people of the State as a whole. *Industrial Development Authority, supra.*

Injection of the Arkansas decision of *City of Hot Springs v. Creviston*, 288 Ark. 286, 705 S.W.2d 415 (1986) is unpersuasive. This foreign case provides no credible authority upon which this Court should overrule existing Kentucky precedent. We are equally unconvinced by the authority of *City of Corbin v. Louisville & N.R. Co.*, 233 Ky. 709, 26 S.W.2d 539 (1930). There is no special privilege here. Toyota, as well as all other taxpayers have a right to expect certain governmental services for their taxes. The fact that utilization of the new taxes generated by an industry can be made so as to support the inducement of such development does not render the arrangement constitutionally infirm.

*Dyche v. City of London*, Ky. 288 S.W.2d 648 (1956) is not appropriate in this situation because that case clearly involved a voted general obligation bond. A comparison of constitutional Sections 170 and 171 is without merit. The fact that the General Assembly may authorize an incorporated city or town to exempt manufacturing establishment from municipal taxation for five years is not applicable to this situation in any manner. It could easily be said that this provision assumes that the State already possesses such authority. This section is clearly not an exception to the rule but the establishment of a rule. The court was correct in holding that SB 361 does not violate Sections 49 and 50 of the Kentucky Constitution.

■ Sections 49 and 50 of the Constitution strictly limit the power of the legislature to financially obligate future legislatures without the permission of the people by means of a direct vote. These constitutional provisions were also part of the Constitution of 1850 and were adopted at the time when the Commonwealth was heavily in debt and the requirement of fiscal restraint on the legislature was considered to be in the best interests of the people. Except for the percentage of indebtedness, it is difficult to say that somewhat similar conditions did not exist in 1985. The Federal Constitution contains no such debt limitations and we are painfully aware of the fact that deficit spending is one of our largest national and international problems.

The State can incur debt by issuing either general obligation bonds or revenue bonds. General obligation bonds are backed by the full faith and credit of the Commonwealth and are payable out of the general revenues of the state. They are voted on by the people. Revenue bonds are not backed by the state but are secured by the revenues of the project which is being financed. Generally the security for the payment of the bonds has taken the form of rentals in building projects or tolls on certain highway projects. In order not to run afoul of the debt limitations found in Sections 49 and 50 of the Constitution, the so-called "serial" leases have been used. Under such a plan, revenue bonds are issued to finance the construction of a public improvement which is then leased by the state and the bonds are retired by lease payments made by the state. Each lease

period runs for two years and the lease automatically renews for another two years unless notice of cancellation is given. Generally these two-year lease renewals run until the bonds are retired. Such a program was allowed in *Turnpike Authority of Ky. v. Wall,* Ky. 336 S.W.2d 551 (1960) and later undisturbed by *Blythe v. Transportation Cabinet,* Ky. 660 S.W.2d 668 (1983).

The judge was correct in holding SB 361 does not violate Sections 49 and 50 of the Kentucky Constitution. As the trial judge observed in his opinion, beginning with the case of *Waller v. Georgetown Board of Education,* 209 Ky. 726, 273 S.W. 498 (1925) Kentucky courts have consistently held that financing projects similar to the one here does not constitute a debt within the meaning of Sections 49 and 50. The reason that no debt has been created is because the financial obligations of the Commonwealth are confined to a particular two-year period and the General Assembly appropriates general fund revenue for debt service accruing during that two-year period only. *Blythe, supra,* upheld a similar plan to issue revenue bonds financing toll road projects. SB 361 provides that the obligation of the Revenue Cabinet to pay debt service on the Toyota bonds is specifically incurred for only the current biennium during which the initial agreement is in effect and which funds have been appropriated for debt service by the legislature. No debt is created and consequently no vote of the people is required under Section 50. *Guthrie v. Curlin,* Ky. 263 S.W.2d 240 (1953).

All such financing plans are within the scope of Sections 49 and 50 and insofar as they involve the two-year fiscal period of the Commonwealth as created by the Constitution. To the extent that there is any duty to pay debt service on special obligations issued by various agencies of the State, that duty is confined to a particular two-year period and the legislature during such time may make a valid appropriation of general fund money to pay debt service accruing during that particular two-year period only. Such financing plans have always been held to be constitutional by this Court. Efforts to impose any financial obligation on state units of government beyond the current two-year period have invariably been held as unconstitutional. *See Curlin v. Weatherby,* Ky. 275 S.W.2d 934 (1955).

An examination of the testimony offered by the executive director of the office of investment and debt management of the Finance and Administration Cabinet indicates that very few of the State Property and Buildings Commission's financing plans provide for revenue bonds secured by a lien or security interest on anything except the revenues derived from the two-year leases. In that regard, the Toyota bonds have basically the same security as all other bond issues of this State. That is, there is no lien or security interest on a financed project, it is secured only by the revenues from the biennial financing agreement and subject to the decision of future legislatures to appropriate any debt service.

The development of the revenue bond concept can be traced through a series of significant cases starting with *J.D. Van Hooser & Co. v. University of Kentucky,* 262 Ky. 581, 90 S.W.2d 1029 (1936) which authorized state educational institutions to construct and finance buildings through the issuance of revenue bonds. *Preston v. Clements,* 313 Ky. 479, 232 S.W.2d 85 (1950) expanded the revenue bond idea to the financing of the Capitol Annex office building. Additional development was added by *Turnpike Authority of Kentucky v. Wall,* Ky. 336 S.W.2d 551 (1960) and later followed in *Blythe v. Transportation Cabinet,* Ky. 660 S.W.2d 668 (1983) which approved legislation providing for revenue bonds to cover economic development of road projects which would be secured by incomes derived from the leasing of such projects to the Department of Transportation with no tolls to be imposed.

The Toyota industrial expansion develops semi-rural land into a highly sophisticated automobile manufacturing complex. In view of the cases previously endorsed by this Court, it is difficult to say that the

Toyota complex suddenly invokes constitutional wrath.

There must be stability to the law so that those who deal with it and rely upon it can have confidence that it will not be changed except for compelling reasons. The previous decisions of this Court have literally interpreted the provisions of Sections 49 and 50 of the Kentucky Constitution in the many decisions which hold that the incurrence of an obligation under a lease or financing agreement which extends only through a single year and which depends solely on the will of a future legislature is not in violation of Sections 49 and 50 of the Constitution. The arguments presented provide no compelling reason to change that history of case law. The constitutional doctrine supporting the two-year renewal financing transaction method has a direct relationship to similar one-year renewable financing plans used by cities and counties which are governed by annual rather than a biennial fiscal period. The legal theory supporting both types of financing is very similar. Cases supporting such a concept may be found beginning with *Hughes v. State Bd. of Health*, 260 Ky. 228, 84 S.W.2d 52 (1935) and continuing and including *White v. Common Council of Middlesboro*, Ky. 414 S.W.2d 569 (1967).

Previous revenue bond issues have avoided the problems raised by the appellees because the bonds financed state-owned, state-operated projects that carried out functions performed by the State and consequently the biennial appropriation of tax money from the State Treasury to an operating department of state government, could qualify as rent to cover current operating expenses of the department. This type of rationale justifies the use of the revenue bond technique in regard to the highway toll issues raised in *Blythe* and *Wall.*

Earlier revenue bonds upheld by this Court provide some security for the bondholder other than the promise of a department of the Commonwealth to seek payment in the form of biennial appropriations from the general fund. The continued existence of the public project which was paid for by the bonds can be considered as fulfilling the function of providing a type of security for the issue.

We do not believe there are truly significant problems in regard to the concept of incremental taxes as defined by the act. It is not necessary or relevant to take into consideration the extent to which taxes may increase from normal economic growth unrelated to Toyota or from inflation or from any other source. The mere fact that the concept of incremental taxes is innovative does not make it constitutionally infirm. It is merely an extension of the lessons learned from *Grimm* and *Fugazzi.*

■ SB 361 does not violate Section 51 of the Kentucky Constitution which prohibits legislation involving more than one subject in the title. *Commonwealth of Kentucky, ex rel Armstrong, Attorney General v. Collins, Governor*, Ky. 709 S.W.2d 437 (1986) states that the title of legislation need only furnish general notification of the general subject in the act. The act in question here is not at variance with Section 51 when judged by that standard.

■ It was not reversible error for the trial court to hold that SB 361 does not violate Section 59 of the Kentucky Constitution which prohibits special legislation. The purpose of this section is to prevent special privileges, favoritism and discrimination in order to ensure equality under the law. This statute authorizes the financing of industrial development projects by the state for the use of industrial entities in order to provide for valid public purposes such as the elimination of unemployment. The law is not directed to the Toyota project although the availability of such a project obviously ignited interest in this method of financing. However, the language of the law is very general and is available for use in connection with any valid industrial development project now or in the future. The classification of industrial development projects is reasonable and the provisions of the act apply equally to any potential industrial development project.

There is a reasonable basis to justify the classification established by the legislature and it should be upheld. *Meredith v. Ray,* 292 Ky. 326, 166 S.W.2d 437 (1942).

The law is available to any industrial entity which agrees to construct and install a facility which satisfies the standards provided by the Buildings Commission and otherwise meets the requirements of the act. Consequently it would be available to every industrial concern even those now operating within the Commonwealth of Kentucky in connection with any expansion of existing enterprises. The public purpose on which all industrial development legislation has been founded has been the inducement of the location of a project which performs the public purpose of providing employment to Kentucky citizens and alleviating any conditions of unemployment.

The judge was correct in determining that the Commission had complied with the provisions of SB 361 in regard to the various standards. The national unemployment rate at the time the Toyota resolution was adopted by the Buildings Commission was 6.8 percent while the unemployment rate in the state was more than 10 percent and was well above 11 percent during January 1986, the month immediately following public announcement of the project. The decision of the circuit judge to deny the intervening defendant's motion to amend their answer in certain respects so as to raise additional constitutional questions did not amount to reversible error. The trial court's decision to refuse to compel production of the work product of counsel for the commission was not reversible error.

It is the holding of this Court that Senate Bill 361 is constitutional. The decision of the circuit court is affirmed.

STEPHENS, C.J., and GANT, LAMBERT and WINTERSHEIMER, JJ., concur.

LEIBSON, STEPHENSON and VANCE, JJ., dissent and each files a separate dissenting opinion.

STEPHENSON, J., also joins in the dissents of LEIBSON and VANCE, JJ.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

One can only hope that in the future this case will be viewed as a fact specific legal aberration, and not a precedent; a decision that our Court was not prepared to hold that the Toyota project offended the Constitution, and nothing more.

If this case becomes a precedent in future cases, it will be a watershed opinion in constitutional law, confirmation that so long as the Governor and General Assembly perceive the need, there are no constitutional restraints on the power of state government to raise and spend money for the benefit of a private business. Although the economic activity generated by Toyota will, hopefully, confer a public benefit as an incident to carrying out its private purpose, Toyota will perform no function of government. Its future contribution to the general welfare, if any, will be only indirect in the same sense that the public benefits more or less from the economic activity generated by every successful private business, the by-products of which are taxes, employment and a general increase in the level of economic activity.

The General Assembly has enacted SB 361 as enabling legislation behind one part of the Toyota Project, the agreement to convey to Toyota cost free a 1,600 acre project site in Scott County, Kentucky. The sum needed to acquire and develop this project will be generated by a bond issue from the State Property and Buildings Commission. The money to pay the debt service on these bonds, principal and interest, will be provided for by appropriations from the general funds of the Commonwealth, raised through taxation, and will flow through to the State Property and Buildings Commission as an expense item in the biennial budget of the Commerce Cabinet. SB 361 designates these bonds as "revenue bonds" and designates the appropriations needed by the Commerce Cabinet to pay the debt service on these bonds as "rent." There is no explanation, and indeed no way to understand, what is being "rented." The "rent" is deemed in SB 361

as generated by the "incremental tax" benefits to the Commonwealth which are anticipated from Toyota's location in Kentucky. The legislation is scripted in this jargon to avoid constitutional limitations on the power of the General Assembly to contract debt. Unfortunately, the question is not whether the terminology applies to concepts which have passed constitutional scrutiny in previous cases, but whether the terminology is appropriate for this case.

In *Fannin v. Williams,* Ky., 655 S.W.2d 480 (1983), we recognize that it is the *substance* of the legislation that determines constitutionality, *not the label.* Legislative incantation, no matter how clever, in itself cannot change the result:

> "We cannot sell the people of Kentucky a mule and call it a horse, even if we believe the public needs a mule." *Id.* at 484.

Ky. Const. §§ 49 and 50 describe limitations on the General Assembly's power to contract debts which foreclose the present legislation unless the financing scheme presented can avoid being classified as a debt contracted on behalf of the Commonwealth. Ky. Const. §§ 3 and 171 foreclose payment of public money to or for the benefit of a private individual or corporation except in consideration of public services and also provide that taxes shall be levied and collected only for public purposes. Ky. Const. § 177 forbids gift, pledge or loan of the credit of the Commonwealth to any individual, company or corporation, and also forbids the Commonwealth from making a donation to any private individual or corporation. It is the *substance* of these various constitutional fiscal restraints which are violated, and the *labels* should not change the results.

In *Commonwealth v. O'Harrah,* Ky., 262 S.W.2d 385, 389 (1953), when faced with a statute that violated the terms of the constitution although arguably of great public benefit, we said:

> "Constitutional provisions, ... are to be enforced according to their letter and spirit, and cannot be evaded by any legislation which, though not in terms trespassing on the letter, yet in substance and effect destroy the grant or limitation."

We stated that we "may not countenance an evasion ... of our fundamental law" no matter how popular the decision would be. *Id.*

We have succumbed to powerful nonjudicial arguments advanced to uphold this legislation in the face of the constitutional challenge. The proponents of SB 361 and the Toyota Agreement urge that we "breathe life" into the 1891 Kentucky Constitution. The benefits to our state to be derived from economic development and job opportunities are represented to us as so great that the constitution must be judicially amended to accommodate the present financing arrangements. It is represented that since construction at the job site is already underway, this project is a fait accompli, and the consequences that will flow from declaring this Act unconstitutional are so grave, we have no choice but to go along. Pressure on the judiciary to find some way around the constitution in the name of political expediency has proved to be overwhelming.

But in my view the Governor, Toyota and the General Assembly should be presumed to have acted with their eyes wide open to the fact that the constitutionality of their financial arrangements was subject to judicial review. Indeed, it is clear from the terminology utilized in both their agreement and in the legislation, terminology carefully crafted from previous decisions of our Court deciding on the constitutionality of past bond issues, that the Governor, Toyota, and the General Assembly understood from the outset that their agreement and the legislation was contingent upon constitutional scrutiny.

If the language of the Constitution is to be rewritten, it should be done by constitutional amendment, by vote of the people, and not as a matter of judicial expediency. Where the words and meaning of the constitution are reasonably in doubt, we can

think in terms of contemporaneous construction. But when called upon to approve a transparent evasion of the plain meaning of the constitutional provisions, we should do so without regard to whether the decision will be unpopular. In *Fannin v. Williams, supra,* we were faced with the onerous duty of declaring unconstitutional a statute supplying text books in the state's nonpublic schools. We stated:

> "The people of Kentucky specified by the language of the Constitution in terms that are clear and unmistakable that the type of expenditure authorized by the statute in question should be unconstitutional. If the people of Kentucky wish to change their position in this matter, it is their right to do so.
>
> ... Section 184 of the Kentucky Constitution provides that public money can be expended for education other than in common schools when a majority of the legal voters approve the expenditure by public referendum. [A provision not unlike that for bond issues in § 50.] If the legislature thinks the people of Kentucky want this change, they should place the matter on the ballot." 655 S.W.2d at 484.

In this dissenting opinion I will take up those constitutional provisions, previously cited, which are in direct conflict with the legislation and financing arrangements. Broadly grouped, there are three: (1) § 49 and 50; (2) §§ 177; and (3) §§ 3 and 171. These provisions are overlapping and interlocking in character. The proponents of the Toyota Agreement and SB 361 have urged us to accept language isolated from past opinions to allow the new legislation to escape one or the other of the various constitutional provisions at issue, disregarding the fact that arguments used to avoid one or the other of these constitutional provisions serve only to trigger another. There is no doubt but that this was done by the Constitutional Convention of 1890 by design to frustrate such evasion. *See McGuffey v. Hall,* Ky., 557 S.W.2d 401, 411 (1977); Official Report of the *Proceedings and Debates in the Convention Assembled at Frankfort, On the Eighth Day of September, 1890, to Adopt, Amend or Change the Constitution of the State of Kentucky,* 4 Volumes (hereinafter referred to as *Constitutional Convention of 1890*).

## I. KENTUCKY CONSTITUTION §§ 49 AND 50

Ky. Const. §§ 49 and 50 provide limitations on the power of the General Assembly to contract debt. § 49 provides a $500,-000 limitation on the amount of such debt. § 50 provides that no debt shall be incurred in excess of the limitations provided in § 49 unless the enabling legislation provides for the debt to be paid off through a bond issue that "shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast."

Because of these two sections, the General Assembly has been unable to enact legislation financing public projects payable by general obligation bonds without a vote of the people. To avoid these limitations the General Assembly has developed a financing arrangement characterized as a "revenue" bond, a type of funding which, when applicable, does not add to the debts of the Commonwealth. SB 361 was enacted as theoretically complying with the revenue bond concept. Until now this revenue bond concept has encompassed the following features:

1) The legislation creates a public agency such as the Turnpike Authority, or designates an existing one, such as the State Property and Buildings Commission, to be entrusted with title to the project and the obligation to pay for it. Thus the Commonwealth is removed from a constitutionally untenable position of borrowing money to pay for the project.

2) The legislation then authorizes this public agency to issue "revenue bonds" to pay the cost of the project. The "revenue" that will be generated by the use of the project after completion will be used to pay off the bonds.

3) The executive department of state government which utilizes the project then pays "rent" to the public agency which has issued the bonds and which ostensibly holds title to the project.

4) The department of state government is provided the money to pay the "rent" by treating the "rent" as a current expense, a cost of doing business covered in the biennial appropriation to the department along with other ongoing, routine expenses necessary to operate the department. Technically, future sessions of the General Assembly are not legally obligated to appropriate money to pay off the debt service on the bond issue.

Through this device the debt service for the project avoids being accounted for as payment of an outstanding obligation against the public treasury. Otherwise the financing scheme would violate §§ 49 and 50 because it would qualify as a debt that requires raising additional tax money. The proponents of the Toyota legislation conceded at oral argument that this bond issue did not meet the criteria of the revenue bond concept, arguing instead that these fiscal restrictions of the constitution were outdated and should be expanded by judicial fiat. Although we do not acknowledge it, we have acceded to that demand.

The development of the concept of revenue bonds as a device to avoid §§ 49 and 50 can be traced through a series of significant cases starting with *J.D. Van Hooser & Co. v. University of Kentucky.*, 262 Ky. 581, 90 S.W.2d 1029 (1936) and culminating in *Blythe v. Transportation Cabinet of Com.*, Ky., 660 S.W.2d 668 (1983).

In *J.D. Van Hooser & Co.*, the General Assembly authorized state educational institutions to construct and finance necessary buildings through the issuance of revenue bonds. We held that the proposed bond issue did not violate the Constitution because the "bonds authorized by the act are payable only from the income and revenues to be derived from the operation of the buildings, and no obligation to pay the bonds or the interest thereon is assumed by

the Commonwealth." *Id.* 90 S.W.2d at 1031.

In *Preston v. Clements*, 313 Ky. 479, 232 S.W.2d 85 (1950), the revenue bond concept was expanded to cover construction and financing of the Capitol Annex office building. The revenue supposedly generated to pay off the bonds was derived from "rentals or operation of the building." Presumably the state offices occupying the building would have to be paying rent somewhere, so our Court agreed to view this arrangement as payment of current operating expense.

The concept was further expanded in *Turnpike Authority of Ky. v. Wall*, Ky., 336 S.W.2d 551 (1960), which permitted a bond issue based on the concept of revenues derived from the operation of state toll roads and additional motor fuel taxes which would be generated by the new toll roads. The funds were segregated and pledged for the payment of rent to pay off the bonds, although as a practical matter the anticipated funds probably would be insufficient to cover the total cost.

The latest expansion of the revenue bond concept came in *Blythe v. Transportation Cabinet*, Ky., 660 S.W.2d 668 (1983). In *Blythe* we approved legislation providing for revenue bonds to cover economic development road projects which would be "secured" solely by income and revenue derived from the leasing of any such project to the Department of Transportation, with no tolls to be imposed. However, in *Blythe* as in *Wall* the Turnpike Authority, the agency issuing the bonds, had possession of the roads and thus something to lease for which "rent" can be expected. In *Blythe* we incorporated by reference preexisting Turnpike Authority statutes into the Economic Development Road Project Act. This was important to the decision because in the preexisting statutes the Department of Transportation was authorized to agree to provide rental income to amortize any bond coming under the Turnpike Authority statutes through pledged motor fuel taxes. Thus, by a rather circuitous route, we gave

the bonds the status of revenue bonds and avoided the present situation where there is no identifiable source for the concept of "rentals" except general tax revenues.

The *Blythe* case stretches the concept of "revenue" bonds supported by the payment of "rent" to the maximum. The further expansion in this case creates an unacceptable judicial credibility gap and a loss of integrity.

In *Dalton v. State Property and Buildings Commission*, Ky., 304 S.W.2d 342, 352 (1957), we defined revenue bonds as follows:

"The term 'revenue bonds' is a descriptive qualification indicating that the instruments are payable solely from a revenue producing public project."

The bond issue must fit this definition to avoid conflict with the constitution. SB 361 exceeds any reasonable application of this definition. It authorizes the Commerce Cabinet to initiate industrial development projects and to finance those "projects" through "revenue bonds" issued by the Property and Buildings Commission. But the Toyota Project Site is not a "public project." *Id.* SB 361 permits, and the Toyota Agreement provides for, the immediate conveyance of the project site to the "Industrial Entity" which is to own and occupy the project. The Industrial Entity (Toyota) that is to occupy the project pays no "revenue" now or in the future, no tangible renumeration to cover the cost of the project site which is conveyed to it. Instead, the Commerce Cabinet will pay the "rent" to pay off the project, but it will neither occupy nor utilize the project in any meaningful sense connected directly with carrying on the activities of the department. The "rent" paid by the Commerce Cabinet will come from future biennial appropriations which SB 361 provides for automatically; the General Assembly would have to legislate to terminate payment of this debt service.

Never before has the revenue bond concept been called upon to cover a project which cannot be described as owned by or in possession of the public agency issuing the bonds until the bonds are paid, and never before has the revenue bond concept been applied where the project did not provide an ongoing service of the kind usually provided by an agency of government. Making motor vehicles does not so qualify.

The requirement for "revenue" generated to cover the cost of the project is addressed in SB 361 through a device designated "incremental taxes." Under SB 361 the concept of "incremental taxes" means the additional state tax revenue which the state anticipates will flow from the location of this new profit making enterprise within the Commonwealth. These "incremental taxes" are deemed sufficient to satisfy the requirement of "rent," but the Commerce Cabinet which is making the rent payments to provide for the debt service has no further connection with the project once it has been approved other than providing the money to pay off the debt.

The concept of incremental taxes as set up in SB 361 means taking taxes that are being paid today within certain specified categories, then comparing this with taxes collected in future years, and classifying any future increase that occurs in tax collections as "incremental taxes" to be attributed to the location of Toyota in Kentucky by legislative mandate. To the extent that the legislation includes taxes paid by Toyota in this total, Toyota is given a double credit for its tax payments: first satisfying current tax obligations and next applying the same taxes towards the "rent" required for the issuance of revenue bonds. This concept violates the constitutional prohibition against the grant of "exclusive, separate public emoluments or privileges" found in the Ky. Const., § 3, for reasons that we will later discuss. For present purposes it is enough to say that it fails to make a general obligation bond into a revenue bond.

To the extent that the legislation gives credit to Toyota for any increase in the tax revenues received from other Kentucky taxpayers, we are engaged in recognizing

as fact the fiction that Toyota is a public facility carrying on the business of the Commerce Cabinet. We should not make this leap in logic. Toyota is a private business engaged in a profit making enterprise. It does not conduct its operation in order to carry on the functions of the Commerce Department except in a remote sense that applies to all privately conducted commercial activity.

Past state bond issues which we have approved as not offending Ky. Const. §§ 49 and 50 were bonds financing state owned, state operated projects, projects that carry out functions performed by the state, and thus the biennial appropriation of tax money from the state treasury to an operating department of state government qualified as "rent" to cover current operating expenses of the department. We cannot stretch the incidental public benefits from Toyota's profit making enterprise to fit this "rent" scenario without doing violence to the Constitution. These bonds cannot qualify as "revenue" bonds. *Their proponents admitted as much at oral argument,* arguing that we should redefine the concept by stretching it to cover any project that serves a public purpose.

Ky. Const. § 50 provides that the limitation on the state's ability to acquire new debt cannot be exceeded without a vote of the people. The effect of our decision is to hold that these bonds are not bonds, that the money that is being used to pay off these bonds is not tax money but new money, and that the annual budgetary appropriation to pay off these bonds is being used to pay current operating expenses of the Commerce Department.

Although the majority opinion implies otherwise, all previous bond issues upheld by our Court provide some security for the bondholders other than the bare promise of the Commonwealth to seek payment in budgetary appropriations from the general fund. If nothing else, the continued existence of the public project which was paid for by the bond issue can be viewed as fulfilling the function of providing a type

of security for the bonds. But here the Project is conveyed to Toyota, and the continued existence of the project is not guaranteed. So, if we are to assume that the current bond issue does no more than promise the bondholders that the Commerce Cabinet will seek future appropriations to pay debt service as a current operating expense, there is no security of any kind for the bonds. There is no credible explanation that our Court can offer in this case to explain away the constitutional limitations in §§ 49 and 50 prohibiting the present financial arrangements.

There are other significant problems with regard to the concept of "incremental taxes" as defined in SB 361(7). To name some of them: the definition in SB 361 fails to take into account the extent to which taxes may increase from economic growth unrelated to Toyota; the taxes are not generated by a publicly operated facility, as with toll roads, but by a privately operated facility which can be closed; Toyota has no obligation so long as it retains any portion of the premises, however small. One must conclude that the concept of "incremental taxes" as used in this case is a "first" for our state and quite probably for any state.

Reluctantly, I conclude that the present financial arrangements violate §§ 49 and 50 of the Kentucky Constitution.

## II. KENTUCKY CONSTITUTION § 177

The pertinent language of § 177 specifies that the "credit of the Commonwealth shall not be given, pledged or loaned to any individual, company, corporation or association ... nor shall the Commonwealth ... make donation to, any company, association or corporation...."

The proposal for financing the Toyota industrial development project and for conveyance of the Toyota Project Site is either a lending of the Commonwealth's credit or a donation to a private corporation. If we accept the premise that the transfer of the 1,600 acre site for the Toyota plant is not a "donation" to a private corporation, then

we are at once impaled upon the constitutional prohibition against the "lending" of the Commonwealth's credit to a private corporation, and vice versa.

### A. A Lending of Credit

The present legislation offers as the reason this transfer is not a donation that it will be paid for by incremental taxes. But if we accept the proposition that Toyota is going to pay for the property through future taxes, the state has surely lent the money in the meantime.

It is a lending of credit because, as stated in the previous section, technically there is supposed to be no other security for the bondholders except the state's promise to provide for payment of debt service in biennial appropriations from the general fund. For each two-year period, as well as future periods, it is the credit of the Commonwealth, and nothing else, to which the bondholder must look for payment. The bond issuer, State Property and Buildings Commission, has neither proprietary nor possessory interest in the project or the project site. Thus, unlike previous bond issues, the issuing agency, the State Property and Buildings Commission, is a mere conduit, but not a stakeholder.

Toyota Corporation is the stakeholder but it has no obligation to generate funds for bond service; not even an obligation to generate "incremental taxes." If it fails to generate incremental taxes, Toyota has no obligation unless and until it elects to convey the entire project site to some third party. At that time, for the first time, it will be required to make up the calculable difference, if any, between the total of incremental tax revenues accruing since the time the property was conveyed to Toyota and the agreed $35,000,000 value of the property. This hypothetical contingent liability supplies no security for the bonds. The reasonable expectation that the Commonwealth will see to the payment of the bonds is the only security, or there is no security.

In past cases there has been, theoretically, a state owned project generating an identified source of revenue to pay off the bonds, even though appropriations from the state treasury provide the debt service. Here, the Act provides no source of revenue for the money that will be used to repay the bonded indebtedness. For debt service purposes it is irrelevant whether incremental taxes are ever collected. The obligation to pay the bonds has no connection to the incremental taxes which the state hopes to generate by the Toyota Project. The incremental taxes are not even credited against the "rent." The Commonwealth's credit is all that stands behind the bonds.

There is no escape from the fact that SB 361 and the Finance Agreement between the Commerce Cabinet and the State Property and Buildings Commission represent to the buying public that the state has arranged to pay the debt service on the bonds from the general fund. This representation is either a lending of the state's credit or a misrepresentation, and we will not designate it the latter.

In *McGuffey v. Hall*, Ky., 557 S.W.2d 401 (1977), we declared unconstitutional an arrangement whereby the state established a Claimant's Compensation Fund to pay medical negligence claims against private health care providers. Although payment of claims would be funded entirely by assessments against members of the fund, because the enabling legislation provided that state money could be temporarily advanced, if necessary, if a shortage should occur in the money available in the fund to pay claims, we held this was an unconstitutional pledge of the state's credit. We held that the prohibition against the pledge of "credit" aspect of Constitution § 177 does not hinge on whether the legislation achieves a "public purpose" when the pledge benefits private individuals. The legislation was written to achieve the availability of medical care, a public purpose comparable to promoting employment which is the avowed purpose of SB 361. In *McGuffey v. Hall*, we said:

"It [§ 177] is a 'clincher,' making certain that if perchance some court might hold

a contingent or secondary liability not to be a 'debt' under Const. § 50, it would nevertheless fall under the interdict of Const. § 177." *Id.* at 411.

In the present situation where the entire project will be owned by a private corporation, the constitutional prohibition against pledging the state's credit for the benefit of a private corporation is not avoided by the budget appropriation device, because the only security for payments on the bonds for the current biennium, as well as in futuro, is the state's credit. As we held in *McGuffey*, although § 177 does not prohibit using the state's credit to back the financial integrity of one of its *own* agencies, it prohibits legislation to do so for any private person, even temporarily, and even though it serves a public purpose.

I have already discussed why the future incremental tax concept in SB 361 does not satisfy any payment obligation on Toyota's part. But if we adopt the opposite premise, then the fact that conveyance occurs at the inception of the financing triggers the prohibition against temporary lending of credit to a private individual or corporation as declared unconstitutional in *McGuffey v. Hall, supra.* Any way one chooses to view the matter, the incremental tax concept does not suffice to circumvent § 177.

### B.  A Donation

Because the prospect of incremental taxes is not payment in any direct sense of the word, the conveyance of the Project Site is a "donation" to a private corporation prohibited by § 177. Toyota's obligation to pay taxes in the future is no more than the obligation of every taxpayer. And the payment of future taxes by persons other than Toyota cannot qualify as payment on behalf of Toyota.

Likewise, Toyota's promise to build a manufacturing and assembly plant in Kentucky does not qualify as sufficient to avoid § 177. While this new business adds to Kentucky's economic development and provides additional jobs to our residents,

the same thing is true with every new business and every expansion of an existing business within this state. The difference between Toyota's business and any other is quantitative and not qualitative, and a quantitative difference does not suffice to satisfy the requirement for payment to the state for the transfer of state property. If we examine the published debates of the Constitutional Convention of 1890, we can only conclude that a primary motivating force behind the Kentucky Constitution of 1891 was to prevent just such legislation as that with which we are confronted. In *Tabler v. Wallace*, Ky., 704 S.W.2d 179, 183-4 (1985), we quoted a sampling from these debates. See *Constitutional Convention of 1890*, 4 Volumes.

"Delegate Young:

'[N]o special provisions for anybody, no exemptions, but all to have the same protection and all live under the same law, and no special benefits to anybody....' Vol. 3, p. 3996–97.

Delegate Knott:

'[L]ook at the ponderous volumes of private acts passed our Legislature within the last few years, and enumerate the horde of railroad and other corporations which have been exempted from taxation, and allowed a variety of other special privileges, while battening like vampires upon the substance of the people; all upon the specious pretext of performing public services.'" Vol. 1, p. 466.

The legislative declaration of a public purpose standing alone is not enough to avoid our constitutional prohibition against public grants to a private person or corporation, no matter how powerful the arguments that the public will benefit from the business conducted by the private enterprise.

### III.  KENTUCKY CONSTITUTION §§ 3 AND 171

When considering the constitutional issues raised by SB 361 and the financial arrangements in this case, §§ 3 and 171 are

complementary and interacting in effect, as well as interacting with § 177, *supra.*

§ 3 provides that "no grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men, except in consideration of public services."

§ 171 provides that "[t]axes shall be levied and collected for public purposes only *and* shall be uniform upon all property of the same class subject to taxation." (Emphasis added.)

As earlier discussed, even if the prospect of future "incremental taxes" from Toyota would be sufficient to escape the proviso against donation to a private corporation in § 177, SB 361 is then in conflict with § 171 because Toyota would benefit by the double counting of future taxes. This means that taxes then are not "uniform upon all property of the same class subject to taxation," as required by § 171. If the "incremental taxes" concept were restricted to the prospect of collections from persons other than Toyota, then Toyota pays nothing for the Project Site and it is a donation in violation of § 177. Going one step further, either way giving Toyota credit for future incremental taxes violates the constitutional proviso in § 3 prohibiting "exclusive, separate public emoluments ... except in consideration of public service."

Taxes have not been "levied and collected for public purposes" as required by § 171 unless those taxes have been paid out or expended to a lawful recipient "in consideration of public services" under § 3. The Constitutional Convention of 1890 acted to forbid the legislature from "grant of exclusive, separate public emoluments ... except in consideration of public services." See quote from Delegate Knott, *supra.*

The constitutional concept of payment from the state treasury for "public services" in § 3 does not permit payment from the Commonwealth for those benefits to the general welfare which flow incidentally from the profit making activity of a private corporation. The Commonwealth cannot pay a private corporation for conducting its business in Kentucky unless it is performing a service directly for the government. The economic activities of the Toyota Corporation are not performed as services to the government, but are conducted for a private purpose. They benefit Toyota Corporation and not the State of Kentucky except in the same general sense that applies as well to the productive activity of all private individuals and corporations within this state. The fact that a by-product of this private economic activity is an incidental benefit to other citizens, through providing employment or otherwise, does not change the character of Toyota's economic activity from private to public. Conveyance to Toyota cost free of the Project Site cannot avoid the prohibition in our constitution against "grant of exclusive, separate public emoluments ... except in consideration of public services" simply because Toyota's operation is bigger and may provide more jobs and more future tax revenue than other businesses. Functioning as a private corporation, Toyota is not entitled to any right not possessed by other private persons or corporations.

The closest case in point is *City of Corbin v. Louisville & N.R. Co.,* 233 Ky. 709, 26 S.W.2d 539 (1930). In that case the governmental entity, the City of Corbin, agreed to a contract with the railroad for reimbursement of a tax assessment in exchange for permission to utilize a portion of the railroad's property in constructing a portion of a sewer system. In holding that the ordinance and contract violated § 3, the Court stated:

"[T]he railroad secured by the ordinance and contract ... a right or privilege denied to other property owners similarly situated.... The ordinance was for the benefit of one taxpayer." *Id.* at 540.

Here Toyota gets a special privilege. It is receiving double credit for future taxes, and also credit for taxes from other businesses supposedly generated by Toyota's presence. Toyota and all taxpayers have equal right to expect and receive certain governmental services for their taxes. But

under SB 361 and the financial arrangements in this case these same taxes are utilized a second time to "pay for" the Project Site.

Toyota Agreement, § 9, illuminates the illusory nature of incremental taxes as consideration for conveying the Project Site to Toyota. Toyota has no obligation to pay anything for the Project Site even if the incremental tax accounting method fails to produce an amount equal to the project's cost, unless at some future time Toyota should elect to dispose of the entire property. SB 361 permits this arrangement. However the Toyota Agreement can make this fictional payment arrangement even more meaningless because Toyota can sell or dispose of portions of the property given to it by the state, portions great or small, with no accounting for it unless and until Toyota sells or disposes of the entire property.

The trial court concluded that the reduction of unemployment was the sole objective of SB 361 and that reduction of unemployment is a valid public purpose within the reasonable exercise of legislative discretion. Reduction of unemployment may well satisfy the requirement of § 171 that taxes must be levied and collected for "public purposes," but public purpose in § 171 requires that the method utilized to attack unemployment be through public means, not private means. A supplement to selected private businesses does not qualify. This is so because under § 3 the only persons entitled to public emoluments are those performing services for the Commonwealth. Although such persons need not be public employees, the services must be those that are directly performed on behalf of the government, not those services which indirectly, incidentally or remotely benefit the public. *Reid v. Robertson*, 304 Ky. 509, 200 S.W.2d 900 (1947).

*Grimm v. Malone*, Ky., 358 S.W.2d 496 (1962) and *Watkins v. Fugazzi*, Ky., 394 S.W.2d 594 (1965), cited as authority in the

majority opinion are different in their facts. In *Grimm* and *Watkins*, we approved the concept that an anticipated increase in receipts from occupational license fees would cover the cost of urban renewal projects. But the urban renewal projects would be government owned and operated, and, unlike our case, no portion of the property would be conveyed to a private corporation without payment of fair market value.[1] Taxpayers' money was not donated directly to a private corporation as an inducement to locate.

The proponents of constitutionality argued that "the public purpose of alleviation of unemployment ... is actually articulated in § 170 of the Kentucky Constitution, which permits the General Assembly to authorize cities 'to exempt manufacturing establishments from municipal taxation for a period not exceeding five years, as an inducement to their location.' "

However, § 170, when juxtaposed with the limitations on the state's power to tax as delineated in the *next* section, 171, provides a compelling argument *against* the constitutionality of the present legislation, rather than serving to support it. If the General Assembly already has the authority to pass laws authorizing municipalities to "exempt manufacturing establishments from municipal taxation, for a period not exceeding five years, as an inducement to their location," under the general taxing authority in § 171, then there is no need for § 170. There is no need to create an exception to a rule, unless first there is a rule. § 171 is the general rule, and § 170 states the exemptions to that rule. This leads to the conclusion that the General Assembly has no authority to exempt manufacturing establishments from municipal taxation as an inducement to their location except as provided in § 170. Likewise, this leads to the conclusion that the "double counting" for taxes mechanism inherent in the present legislation violates the uniform tax assessment and collection proviso in § 171.

---

1. The primary purposes of the plan was to "induce" the U.S. Housing and Home Finance Administrator to make a federal grant of three-fourths of the cost.

The proponents of constitutionality have admitted that, in the final analysis, it is the "inducement" of the Toyota Corporation to locate a major manufacturing and assembly plant in this state, with the incidental economic benefits that should follow, and this alone, that must suffice to meet the various constitutional challenges raised by the expenditure of $35,000,000 from the public treasury to cover the cost of the Project Site which will then be conveyed cost free to the Toyota Corporation. It does not suffice.

It has been over thirty years since our Court has forthrightly declared a major bond issue unconstitutional. *Curlin v. Weatherby*, Ky., 275 S.W.2d 934 (1955). For reasons stated at the outset, this is an exceedingly difficult step for our Court to take. It is time that we apply to bond issues the controlling principles of constitutional construction stated in *Commonwealth v. O'Harrah, supra,* and *Fannin v. Williams, supra:*

> "[W]e must look through the form of the statute to the substance of what it does. The courts may not countenance an evasion or even an unintentional avoidance of our fundamental law." 655 S.W.2d at 484.

We have reached the point reached by the Arkansas Supreme Court in *City of Hot Springs v. Creviston*, 288 Ark. 286, 705 S.W.2d 415, (1986). Like our Court, the Arkansas Court had been steadily eroding constitutional limitations on state bond financing. Finally, faced by an industrial revenue bond issue with problems in some respects similar to our own, the Arkansas Court stated:

> "We believe that the only proper and permanent course is for us simply to give effect to the plain language of the Constitution. It states that no city or county shall ever issue interest-bearing evidences of indebtedness without the consent of the electors. That mandate is binding. It includes, of course, transparent evasions by which a token commission or other body is created to sign the

bonds while disclaiming any responsibility on the part of its creator." *Id.* at 417.

The present legislation and financing arrangements violate §§ 49 and 50, § 177, and §§ 3 and 171 of our Constitution, and we should so state, putting aside every result-oriented, nonjudicial, nonlegal argument to the contrary.

STEPHENSON, J., joins in this dissent.

STEPHENSON, Justice, dissenting.

The dissenting opinion by Justice Leibson is an excellent analysis of the constitutional infirmities of the majority opinion, and I concur in that dissent.

I write only to emphasize what I consider the principal errors in the majority opinion.

In discussing Section 177 of the Constitution of Kentucky, the majority opinion makes this astonishing statement: "However, as long as the expenditure of public money has, as its purpose, the effectuation of a valid public purpose, Section 177 is not offended even in situations where the conveyance occurs without consideration." The two cases cited in support of this proposition are not in point. Both *Industrial Development* and *Kentucky Livestock Breeders* involved a challenge pertaining to Section 171 of the Constitution and not Section 177. Both involved appropriating tax money for a "public purpose." Section 177 provides that:

> The credit of the Commonwealth shall not be given, pledged or loaned to any individual, company, corporation or association, municipality, or political subdivision of the State; nor shall the Commonwealth become an owner or stockholder in, nor make donation to, any company, association or corporation; ....

Section 177 does not, anywhere, mention "public purpose." In effect, the majority opinion has amended Section 177 by adding "except for a valid public purpose." Together with leaving the determination of public purpose to the legislature, the major-

ity opinion has in effect repealed Section 177. I feel more comfortable in having the people vote on amendments to the Constitution or repeal of entire sections.

In its rush to assert that the statute does not offend Section 177, the majority has overlooked our holding in *McGuffey v. Hall*, Ky., 557 S.W.2d 401 (1977), where we said:

> With respect to Const. § 177, which prohibits lending the credit of the Commonwealth, *Hager v. Kentucky Children's Home Soc.*, 119 Ky. 235, 83 S.W. 605, 607, 67 LRA 815 (1904), held that an annual appropriation of $15,000 to a charitable corporation devoted to the care of destitute children did not involve a giving or lending of credit. The opinion then went on to say that because the purpose was public the act did not offend Const. § 171, and there has been some tendency to misconstrue the language of *Hager* referring to Const. § 171 as applicable to Const. § 177 as well. Clearly, however, whether the objects of an expenditure are "public" or otherwise is irrelevant to Const. § 177:
>
> "The state cannot now loan or give its credit to any person or corporation for any purpose—public or otherwise." *Hager v. Kentucky Children's Home Soc.*, supra, 119 Ky. 235, at 83 S.W. 607.

This holding is in direct conflict with the majority opinion.

Further, the majority opinion relies on the reasoning in *Almond v. Day*. It is indeed curious that now the majority is persuaded by *Almond v. Day* when *McGuffey* emphatically rejected the same reasoning.

> After holding that a loan of public money does not involve the public credit, the opinion in *Industrial Develop. Auth. v. Eastern Ky. Reg. Pl. Com'n*, supra, at 332 S.W.2d 274, cites the following excerpt from *Almond v. Day*, 197 Va. 782, 91 S.E.2d 660, 667 (1956):
>
> "When the underlying and activating purpose of the transaction and the financial obligation incurred are for the state's

benefit, there is no lending of its credit. . . . "

The statement is too broad. As specifically pointed out in *Hager* (119 Ky. 235, 83 S.W. at p. 607), Const. § 177 does not permit the state's credit to be given or lent for any purpose, public or otherwise.

I wonder if the majority is ready to overrule *McGuffey* with a judicial amendment to Section 177.

In my opinion, the transaction with Toyota is a gift. The state will purchase and deliver a deed to Toyota with no lien or other reservation. The majority approves as consideration the funny theory of incremental taxes. These are the taxes paid by any other business for the benefits of government, including, unfortunately, payment of principal and interest on revenue bonds previously issued. It is a charade to say that incremental taxes are a consideration for the conveyance. Even accepting this theory, that leaves Toyota paying for the land on the easy-payment plan. If this is not giving, pledging, or loaning the credit of the Commonwealth, then nothing is.

To sum it up, this transaction is either a donation or a giving or pledging of credit. Either way, the transaction violates Section 177.

I have one other comment on the majority opinion as it treats Sections 49 and 50.

The majority opinion states that the sums needed to acquire and develop the site for Toyota will be generated by a revenue bond issue and that the funds needed to pay the debt service on the bonds' principal and interest will be provided by appropriations from the General Funds of the Commonwealth on a biennial basis as an expense item of the Commerce Cabinet. This statement truly portrays the situation; there is no revenue, and the bonds are really considered as obligations of the Commonwealth.

A revenue bond is one that is retired by revenue from the project which is being financed. It is noteworthy that the majority opinion recites the reason for the adop-

tion of Sections 49 and 50; that is, the Commonwealth was heavily in debt and fiscal restraint was considered to be in the best interests of the people. This is the situation today with more and more of the General Fund going to pay the principal and interest of so-called revenue bonds. It is unfortunate that this court ever engaged in the fiction that these revenue bonds, which do not produce revenue, are not obligations of the Commonwealth. We know, and the executive and legislative branches know, that each legislature will appropriate funds from the General Fund to pay principal and interest on these bonds and that they dare not decline to do so in order to maintain the credit of the Commonwealth.

At least, up to now, in engaging in this fiction the property to be financed was owned by the Commonwealth. This made the fiction more palatable to the court. Here, the Commonwealth is to deed the property to a private corporation and retain no interest at all in the property. It was conceded at oral argument that this concept is a step further than any of the cases decided by this court.

Adopting this concept by the majority gives the legislature a free hand to increase debt for the Commonwealth without any hindrance from this court. This debases Sections 49 and 50 to no meaning at all.

Accordingly, I dissent.

VANCE, Justice, dissenting.

In this year, 1987, while we are celebrating the 200th anniversary of the United States Constitution, this court has, I believe, eviscerated the Kentucky Constitution. The disemboweled sections 3, 49, 50, 59, 171, and 177 lie scattered about us.

Section 177 of the Kentucky Constitution clearly provides that the credit of the Commonwealth shall not be given, pledged, or loaned to any individual, company or corporation and that the Commonwealth shall not make a donation to any company, association, or corporation.

The majority concludes that the conveyance of the Toyota building site by the Commonwealth to Toyota is not a gift or donation to a corporation because the Commonwealth will receive fair market value for the property conveyed. This is so, the majority reasons, because the construction and operation of the Toyota manufacturing plant will generate new tax revenues which the state would not receive except for the location of the Toyota plant in Kentucky. These new (or incremental) taxes are considered by the majority to constitute payment for the $35,000,000 building site.

Taxes are the price that a taxpayer pays for the benefits received from government. It is true that once Toyota has erected an $800,000,000 manufacturing plant upon the project site, the property will generate more state tax revenue than it generated before the construction of the plant. The increase in taxes, however, will do no more than pay for Toyota's pro rata share of the police protection and other benefits of government that it will receive from the Commonwealth of Kentucky. Our constitution, § 171, requires that taxes be uniform upon each class of property subject to taxation. If the tax rate upon Toyota's property is to be uniform with that of other taxpayers, the collection of taxes assessed against its property will only uniformly pay its pro rata share of the cost of state government. It follows, therefore, that if the taxes collected from Toyota are to be viewed as its fair share of the cost of the benefits provided by the Commonwealth to Toyota, then those same tax receipts cannot also be considered to constitute the purchase price for the Toyota building site. By the same token, if taxes paid by Toyota are to be considered as a payment for the land conveyed to it by the Commonwealth, then, in fact, Toyota will be excused from paying anything as its fair share of the cost of benefits provided to it by the state government.

To say that the taxes paid by Toyota will be counted once as its payment of its share of the cost of government and be counted a second time as its payment for the purchase price of the property conveyed to it

by the Commonwealth, gives to Toyota a dual benefit from its taxes that is not accorded to any other taxpayer. I cannot find any place in the majority opinion which faces up to the impropriety and unconstitutionality of this double benefit from taxes. The majority opinion simply begs the question when it states:

"Under no conditions is Toyota the beneficiary of any double counting of future taxes. The taxes involved are uniform on all property of the same class subject to taxation."

Of course the tax rate will be uniform, but that does not answer or even face up to the question as to why Toyota's taxes can be considered as both a payment for property and as the payment of its fair share of the cost of government.

Likewise, I believe the majority engages in pure sophistry when it states:

"... there is no attempt to exempt any corporation from taxation but rather there is a commitment required by law to pay additional and new taxes...."

This does nothing to explain why the use of Toyota's taxes as a purchase price for property does not in fact result in an exemption of Toyota from sharing in the cost of government. Of course, Toyota will pay additional taxes on the project site, but that is solely because Toyota will construct an $800,000,000 improvement upon the property and will receive government protection on that $800,000,000 investment.

It is true that the operation of the Toyota manufacturing plant will doubtless generate other taxes, such as the income tax to be paid by Toyota employees. Taxes paid by Toyota employees, like taxes paid by all other taxpayers, are paid to sustain the cost of government and cannot reasonably be diverted to pay for land to be owned by a private corporation. It is one thing to admit that the Toyota plant will generate tax revenue that the Commonwealth would not otherwise have received. It is quite another thing to say that the new tax revenue is not, like all other taxes, the taxpay-

er's fair portion of the cost of government but instead should be credited as the purchase price of property conveyed to Toyota by the Commonwealth.

If, however, for the purposes of discussion only, it be conceded that the tax revenues to be generated by the Toyota manufacturing plant can be considered to be payment of the fair cash value of the Toyota building site, it must be noted that this payment will take place over a number of years. The thesis is that the Commonwealth will borrow $35,000,000 immediately and issue bonds therefor. The Commonwealth will then retire these bonds over a period of years by appropriations from the general fund. Meanwhile, the new taxes to be generated by Toyota which are to be considered as payment for the property will be collected over the life of the bond issue. In essence, the Commonwealth will have borrowed the money to pay for property for Toyota and thereby will have loaned its credit to Toyota.

Of course, after the taxes generated by Toyota have equaled the cost of the project site (presumably within 30 years) Toyota will continue to pay taxes at a uniform rate. Then, and only then, will Toyota begin to assume its fair share of the cost of the benefits provided by the Commonwealth.

I believe the financing agreement devised for the Toyota project is a donation of land to Toyota, pure and simple, and is in violation of § 177 of the Kentucky Constitution. I also believe that the interpretation of § 177 by the majority in such a manner as to approve the Toyota agreement, in reality, renders § 177 null and void to a significant degree.

Section 49 of the Kentucky Constitution provides:

"The General Assembly may contract debts to meet casual deficits or failures in the revenue; but such debts, direct or contingent, singly or in the aggregate, shall not at any time exceed five hundred thousand dollars, and the moneys arising from loans creating such debts shall be

applied only to the purpose or purposes for which they were obtained, or to repay such debts: Provided, The General Assembly may contract debts to repel invasion, suppress insurrection, or, if hostilities are threatened, provide for the public defense."

Section 50 of the Kentucky Constitution provides:

"No act of the General Assembly shall authorize any debt to be contracted on behalf of the Commonwealth except for the purposes mentioned in section 49, unless provision be made therein to levy and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it: Provided, The General Assembly may contract debts by borrowing money to pay any part of the debt of the State, without submission to the people, and without making provision in the act authorizing the same for a tax to discharge the debt so contracted, or the interest thereon."

These sections of the Kentucky Constitution were clearly designed to restrict the power of the General Assembly to obligate the revenue of the Commonwealth beyond the biennium of the Assembly. The delegates to the constitutional convention knew that a sitting legislature, with power to incur indebtedness obligating revenue in future years, could pile up such a catastrophic debt as to seriously impede the future operation of the government.

Those delegates took two measures to interdict such a potential disaster. They required first that any indebtedness in excess of $500,000 be approved by a vote of the people, and second, that the act authorizing the debt provide for the levy and collection of an annual tax sufficient to pay the interest and to discharge the debt.

Subsequent General Assemblies have considered our constitution too restrictive in its provisions concerning debt and have, so far, succeeded in evading the constitutional requirement of submitting debt issues to a vote of the people and the requirement that an annual tax be levied to pay the interest and to discharge the debt.

This has been accomplished by means of the "revenue bond," a fiction whereby money borrowed does not constitute a debt. Revenue bonds, in the language of the statute authorizing them and as stated upon their face, do not constitute an obligation of the Commonwealth. They are to be retired solely from income realized from the project which they were issued to finance. Most often the completed project is leased to the state in two-year periods, and the bonds are retired from the lease payments made by the state.

In this case, however, the property will not be owned by a state agency but will be owned by Toyota. The state will not lease the property from Toyota, but will simply advance money out of the general treasury each biennium to retire the bonds.

In *Turnpike Authority of Kentucky v. Wall*, Ky., 336 S.W.2d 551 (1960), this court upheld the concept that revenue bonds did not constitute an obligation of the state, and consequently they could be issued without a vote of approval by the people and without the levy of an annual tax to retire the bonds. *Wall* accepted, at face value, the contention that a future General Assembly, in each biennium, would consider the merits of continuing to lease the projects financed with revenue bonds, and could, if it so desired, freely refuse to continue the lease.

As a practical matter, however, a future General Assembly will find itself nearly powerless to refuse to appropriate funds for the retirement of the Toyota revenue bond issue, just as the present and past General Assemblies have been unable to disavow the obligation to appropriate funds for the retirement of past "revenue bond" issues.

To default upon the "revenue bonds" would instantly destroy the credit of the

Commonwealth and would be calamitous. No reasonable legislator would consider such a course.

Millions of dollars of current tax revenue which should have been subject to such use as the current General Assembly would make of it has been obligated to pay interest and principal upon "revenue bond" issues created by past legislative enactment. Those millions are simply not available for current use.

The option to disavow an issue of "revenue bonds" is scarcely a free choice. To some extent a revenue bond, if not a debt, is at least an obligation which future administrations will find difficult to disavow. To that extent, the clear intent of Constitution Sections 49 and 50 to limit the power of the General Assembly to obligate future revenue of the Commonwealth beyond a two-year period will have been circumvented.

An act which appears constitutional upon its face may nevertheless be unconstitutional in its application. I do not believe that *Turnpike Authority v. Wall, supra,* addresses the constitutionality of these acts in their application.

In *Commonwealth v. O'Harrah,* Ky., 262 S.W.2d 385, 389 (1953) we held:

" 'Constitutional provisions, whether operating by way of grant or limitation, are to be enforced according to their letter and spirit, and cannot be evaded by any legislation which, though not in terms trespassing on the letter, yet in substance and effect destroy the grant or limitation.'

"In appraising the validity of the statute we must look through the form of the statute to the substance of what it does. The courts may not countenance an evasion or even an unintentional avoidance of our fundamental law."

This dissent is not meant to impugn the validity of bonds heretofore issued and validated under the principles announced in *Turnpike Authority v. Wall, supra.* I simply believe that *Wall* is not conclusive of all the issues presented by this case.

The majority cites *Blythe v. Transportation Cabinet of the Commonwealth of Kentucky, et al.,* Ky., 660 S.W.2d 668 (1983) as a continuation of the line of cases which have approved revenue bonds. On the contrary, *Blythe* simply held, as did *Wall, supra,* that the statute on its face is not unconstitutional. It did not address the question of whether the statute in its application is unconstitutional. Neither did it approve the bond issue in question, but left to subsequent litigation, the determination of the validity of the bonds at issue. To my knowledge there has been no such subsequent litigation to determine the validity of those bonds, and in my judgment the state treasurer acts at his peril in paying any interest or principal of that particular revenue bond issue.

Three members of this court joined in a dissent in *Blythe, supra.* That dissent, together with the fact that the court refused to approve the bond issue therein, should have raised a flag of warning that in the future some consideration would be given to the practical obligation imposed upon the Commonwealth by an issue of revenue bonds and might determine that such bonds constitute an indebtedness within the meaning of § 49 and § 50 of the Constitution, despite the statutory language that they should not be considered an indebtedness of the Commonwealth.

The Toyota bonds are not revenue bonds in a true sense. They will be retired solely by appropriations from the state treasury. No agency of the Commonwealth will own the land, and so even the fiction that the state will pay rent for the use of the project cannot be indulged.

I believe it is a fiction to say that the Commonwealth will have no obligation to retire the Toyota revenue bonds in an orderly manner. There is simply no other method for the purchasers of the bonds to recover their money from any source except the state treasury. In other "revenue bond" issues there has been some asset capable of producing revenue which would give some security to bondholders in case

of default. That is not true here. The asset will belong to Toyota, and it has no obligation to the bondholders. To hold that the Commonwealth can issue bonds and then refuse to repay them when there is no other source of security for the bondholder is to approve the commission of a fraud by the Commonwealth.

The purpose of § 49 and § 50 of the Constitution of Kentucky is to prevent a current General Assembly from obligating tax revenues of future years. In my judgment, the result of this case is a complete evasion of the letter and the spirit of those Sections.

No doubt the proponents of the Toyota agreement have been led to believe, based upon past decisions of this court, that we will wink at apparent evasions of the Constitution when they are considered to be imperative for the progress of the state and the benefit of the public. In fact, the public never benefits, in the long run, from any evasion of the Constitution. Evasion simply erodes the fabric of constitutional government.

Finally, I believe that SB 361 is special legislation in violation of the Kentucky Constitution, § 59. It creates a class of revenue bonds which are available to Toyota and perhaps to other business entities, but certainly not to all. So far as I can determine, there are no standards to measure eligibility as to beneficiaries of this class of "revenue bonds."

The stated purpose of the act is to promote gainful employment, economic development opportunities and general welfare by creation of an authority to enable the Commonwealth to acquire and develop industrial sites for occupancy, use, lease, or conveyance to industrial corporations and other entities.

Every industrial development project can be expected to produce new taxes. In many cases, the new taxes would be sufficient to equal the cost of the project site in 30 years. It does not follow, however, that every such project would become eligible for a "revenue bond issue" to purchase property for it and to use the taxes generated by the project as payment for the property. The only criteria established in the act for eligibility is that projects may be financed by "revenue bonds" only at the request of the Commerce Department, and:

"1. The subject industrial entity agrees in writing prior to the issuance of any revenue bonds to construct and acquire in connection with the industrial development project manufacturing, processing and assembling facilities satisfactory to the commission;

"2. The commission makes a finding in writing, that, based upon diligent investigation, the aggregate incremental taxes to be received by the Commonwealth as a result of such industrial development project are reasonably expected, over the life of the revenue bond issue, to be at least equal to the principal amount of any revenue bonds issued to finance such industrial development project;

"3. The industrial development project is separately approved in writing by the governor;

"4. The industrial development project is separately approved and authorized by the general assembly; and

"5. Any revenue bond proceedings for the financing of an industrial development project provide that in the event of any disposition by an industrial entity of any such industrial development project previously conveyed to such industrial entity prior to the collection by the Commonwealth of incremental taxes in the amount specified in subparagraph 2. of this paragraph, the subject industrial entity shall pay to the Commonwealth an amount equal to the difference between the aggregate incremental taxes collected by the Commonwealth to such date of disposition and the principal amount of such revenue bonds."

The door is thus opened wide for the Commerce Department, the Governor, and the General Assembly to bestow at will the

benefits of this type of financial arrangement upon its friends and to deny it to others. These benefits are substantial, and to pass Constitutional muster, eligibility should be determined upon the basis of established standards or classifications so that all who meet the standards may have the benefit of the act, and all who fail to meet the standards will be denied the benefits. Eligibility should not be allowed to depend upon such nonobjective factors as approval of the Commerce Cabinet, the Governor, and the General Assembly.

STEPHENSON, J., joins in this dissent.